**UNITED STATES of America, Appellee,**

v.

**Rosalind Edith CHANDLER, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Frederick Freeman LEISTER, Jr., Appellant.**

**Nos. 9829, 9954.**

United States Court of Appeals Fourth Circuit.

Argued June 20, 1966.

Decided April 4, 1968.

No. 9829:

Stanley E. Sacks, Norfolk, Va. (Sacks, Sacks & Kendall, Norfolk, Va., on brief), for appellant.

C. V. Spratley, Jr., U. S. Atty., and James A. Oast, Jr., Asst. U. S. Atty., for appellee.

No. 9954:

D. Reece Williams, III, Columbia, S. C. (Court-appointed counsel), for appellant.

Thomas P. Curran, Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL,* Circuit Judges, sitting en banc.

HAYNSWORTH, Chief Judge:

En banc hearings were separately held in two cases in order to consider fully the appropriateness of the standards of mental responsibility employed in determining the guilt of defendants charged with crime. In the one case, the Court applied the M'Naghten—irresistible impulse test. In the other, alternative findings were made within the American Law Institute's recommended formulation and in terms of the M'Naghten and irresistible impulse tests. We affirm the conviction in each instance, for reasons later appearing, but we reject the M'Naghten test.

*Chandler*

Rosalind Chandler, tried by the Court without a jury on a charge of murder, was convicted of voluntary manslaughter and sentenced to imprisonment for nine years with immediate parole eligibility. On appeal, she contends that her act was the product of a mental disease, and that she should not be legally accountable for it.

Mrs. Chandler, the wife of a chief petty officer in the Navy, slew her husband while aboard his ship. After an evening of drinking, the two, with two other chiefs, had gone aboard the ship to get some things from Chandler's locker. There was testimony that Mrs.

* Judge Bell participated in the hearing but died before the opinion was prepared.

Chandler discovered in her husband's locker a letter, later introduced at the trial, addressed to him by another woman, in which the writer inquired about Chandler's continuing purpose to obtain a divorce. Mrs. Chandler began to abuse her husband verbally and to slap his face.[1] Chandler then kicked his wife in the area of the crotch sending her reeling backward against a buffet. She snatched open a drawer of the buffet, and seized a butcher knife with which she attacked her husband. After one or two misses, as Chandler stumbled backward over some furniture, she drove the knife into his chest, inflicting a wound of which he died almost immediately.

Mrs. Chandler quickly became repentant and was soon hysterical.

At a very early age, Mrs. Chandler was convicted of auto theft. After she became adult and moved to Norfolk, there was a steady succession of misdemeanor convictions, for drunkenness, immoral conduct [2] and disorderly conduct. She and her husband were given to excessive drink, and the psychiatric history indicates much reciprocal abuse, physical, verbal and psychological, of each other. Approximately two months before the homicide, she reported, Chandler struck her with a crutch, and she sustained a fracture of the jaw.

As a result of a pretrial psychiatric investigation at St. Elizabeth's Hospital, there was a diagnosis of "passive aggressive personality with alcoholic features." Such a person, a psychiatrist testified, was inclined to exaggerate human characteristics, to be immature emotionally and to give expression to anger in procrastination, pouting, stubbornness or violence. In Mrs. Chandler's case, the condition is moderate, and her intelligence is in the lower range of normalcy.

She has no delusions, no hallucinations, no paranoia. Her speech is relevant and coherent. In the opinion of the psychiatrist, she can readily distinguish between right and wrong and can conform her conduct to what she knows to be right, but, at the moment of the fatal attack upon her husband, she was not considering such things.

The psychiatrist thought her condition properly classified as a mental disease and her act a probable product of it and of passion and anger.

Psychiatric hospitalization was thought not essential.

The District Court found Mrs. Chandler mentally competent and guilty of voluntary manslaughter, which, it noted, was the voluntary killing of another without malice in the sudden heat of passion.

### Leister

Tried to the Court, without a jury, Leister was convicted of bank robbery, and a sentence of fifteen years was imposed upon him with a recommendation that he receive psychiatric treatment and assistance and with parole eligibility in the discretion of the Parole Board.[3]

Leister approached a District of Columbia policeman with a proposal that they collaborate in the robbery of a bank. His choice of an accomplice was not misguided, for the policeman completely abandoned his public trust.[4] Together, the two planned the robbery of a suburban bank in Maryland, and, approximately two weeks after the initial discussion, they robbed the bank they had selected. While the policeman held the manager at gunpoint, Leister, armed with another pistol supplied by the policeman, vaulted over the counter and emptied the tellers' cash drawers. He left his fingerprints on the counter, however, for he neglected to use the rubber gloves they had procured.

1. Mrs. Chandler denied that she saw the letter at that time. Her husband was verbally chastising her, she said, because of her apparent submission to a fleeting embrace by one of the other chiefs.

2. Apparently, prostitution. Fines were imposed upon such convictions, and she was held for physical examination.

3. 18 U.S.C.A. § 4208(a) (2).

4. He thought he was already in difficulty with the police department, and, because of his participation in the crime, a sentence was imposed upon him for bank robbery.

Leister is an attractive, intelligent man. He had an unhappy childhood. The son of a harsh and unsympathetic father and of an indifferent and sexually promiscuous mother, he was in the principal care of a grandmother. She, he felt, had little affection for him because he reminded her of his father, whom she detested. As a result, psychiatrists testified, he grew up with a sense of rejection and of animosity toward society.

In the Army, he went absent without leave with little reason. Paroled from a sentence for a felony, he violated the terms of his parole, with little reason in the opinion of the psychiatrists, by going to Canada. He married a registered nurse, but he moved her, and later their two children, from place to place. Apparently, he found ready employment as a linotype operator; she, as a nurse.

The diagnosis of one psychiatrist was that he had a "psychoneurotic reaction," a term he equated with neurosis. Leister is neurotic, he said, but not psychotic, an appraisal with which the other psychiatrists agreed. The other psychiatric witnesses used the diagnostic appellation, "emotionally unstable personality," but the difference in the labels is unimportant, for they evince no difference in the underlying psychiatric appraisal.

Leister is fully aware of the nature of his acts and the wrongfulness of criminal conduct. Generally, he is capable of conforming his conduct to the requirements of the law, but when he becomes emotional, he tends to act irresponsibly. His attitude is antisocial, and it will manifest itself sometimes in antisocial conduct, but, at any time, he has the capacity to control his conduct if he wishes to.

On that evidence the District Court found Leister mentally competent and guilty of the bank robbery. It found that Leister was suffering from a mental disease which impaired his personal relationships and affected his capacity to control impulsive reactions to real or fancied slights. The Court noted, however, that there was nothing impulsive about the bank robbery, as the two-week duration of the planning period demonstrated. It made specific findings in the phraseology of the recommended American Law Institute test that Leister, when robbing the bank, did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Alternatively, it found that Leister knew the difference between right and wrong and that the robbery was not the result of an irresistible impulse.

Upon conviction, the District Court committed Leister under the provisions of 18 U.S.C.A. § 4208(b) for study. The very full report submitted upon completion of that study formed the basis for a motion for a new trial on the ground of after-discovered evidence, for the report contains suggestions that projective psychological testing contained indications of schizophrenic reaction of a chronic undifferentiated type. The psychiatric diagnosis, however, was sociopathic personality disturbance, antisocial type, and that was the primary diagnosis rendered by the psychological testing. The psychologist's report that testing shows "symptom formations suggestive of a schizophrenic personality disorder" does not alter the basic description of the man as disclosed by the psychiatrists at the trial. The very full Springfield report parallels the earlier testimony. It fully describes Leister's sense of rejection, the resentment of his parents, his brittle emotions, his resentment against society for his treatment by his parents and state authorities and for its failure to supply him with the help he felt he needed. The staff at Springfield reached the conclusion that Leister is not psychotic, but his personality structure is fragile, and any meaningful help would require intensive personalized psychiatric treatment over a period of a number of years. Such treatment is unavailable at Springfield, and the staff recommended confinement at a medium security prison for adults. Without the unavailable help, no substantial improvement can be expected.

Upon Leister's return to the Court and its consideration of the Springfield report, Leister was afforded a further right of allocution, and a sentence of fifteen years imprisonment was imposed upon him, subject to parole at such time as the Board of Parole may determine. The motion for a new trial founded upon the reference to schizophrenia in the Springfield report was overruled.[5]

### Standards of Mental Responsibility ·

We plow no new ground. In recent years so much has been carefully and painstakingly written on the history of the problem and its resolution that there is little to be added to such opinions as that of Judge Kaufman in United States v. Freeman, 2 Cir., 357 F.2d 606, and see Biggs, "The Guilty Mind: Psychiatry and the Law of Homicide" (1955); Thomsen, "Insanity as a Defense to Crime," XIX Maryland Law Review 271.

For our own perspective, however, we may note that the salutary evolution of the notion that public retribution should not be visited upon one whose transgression of the law was not morally censurable because of mental incompetence had progressed very substantially by the opening of the Nineteenth Century. In Hadfield's Case, 27 State Trials, 1281 (1800), the Chief Justice submitted what was tantamount to a peremptory instruction of acquittal. Hadfield, a former soldier, had suffered a severe head wound. Believing himself the savior of mankind, he sought to achieve martyrdom by killing King George, III. He succeeded in wounding an equerry. Hadfield, of course, was no "wild beast,"[6] and the language of the instruction was a very enlightened one for its time. The issue was posed to the jury in terms of whether or not Hadfield's act was "so

under the guidance of reason" as to make him answerable for it. The formulation, embracing both the cognitive and voluntary aspects of the problem would approach acceptance today among those who have entirely rejected the M'Naghten Rules.

Forty-three years later M'Naghten was similarly acquitted.[7] He suffered delusions of persecution which led him to undertake the assassination of the Prime Minister, Robert Peel. Mistaking the Prime Minister's secretary, Robert Drummond, for Peel, M'Naghten slew Drummond. The event of the trial was consistent with that in Hadfield's Case, and was reached only after full inquiry into M'Naghten's mental condition and the nature of his aberration. Unfortunately, however, the language of the substantially peremptory instruction was a reversion to the old right and wrong dichotomy, and this was carried forward in the later advisory opinion of the House of Lords rendered in response to the indignant inquiries of the Queen. As phrased in the House of Lords, an acquittal should be had if "the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know that he was doing what was wrong."

Despite the result in M'Naghten's Case, its verbal rationalization was a recession from Hadfield's formulation, and coming from so eminent an authority as the House of Lords itself, it had a prolonged tendency to perpetuate itself as the only acceptable verbiage for instructing a jury on the issue of a defendant's mental competence. The influence of Dr. Ray, whose views had been presented to the court in M'Naghten's trial,

---

5. There was no merit in the motion for a new trial on the ground of after-discovered evidence. The psychological evaluation does contain indications of schizophrenia, but counsel's conclusion that it shows that Leister is suffering from a severe psychosis is at odds with the Springfield report's conclusion that Leister is not psychotic. Its general description of Leister was not at variance with the testimony at the trial, and its consideration at a new trial would probably not result in a different conclusion.

6. Arnold's Case, 16 State Trials 695 (1723).

7. M'Naghten's Case, 10 Clark & Fin. 200, 8 Eng.Rep. 718 (H.L. 1843).

led the Supreme Court of New Hampshire to adopt a substantial equivalent of the later Durham Rule,[8] and in 1877, in an enlightened opinion, the Supreme Court of Alabama held that for criminal responsibility, there must be a conjunction of (1) capacity for intellectual discrimination between right and wrong, and (2) freedom of will to choose between the two. In amplification, the latter element was said to be the "power of volition to adhere in action to the right and to abstain from the wrong."[9]

Generally, however, the M'Naghten Rule with the addition of an irresistible impulse complement, remained in full flower until 1954.

The M'Naghten Rule was an unhappy formulation of the enlightened idea that the judges sought to express. Its emphasis was substantially exclusively upon the cognitive aspects of the problem, though that would not seem to have been the actual issue in M'Naghten's trial. The exclusivity of emphasis was moderated by the addition of the irresistible impulse test, but each branch of the test remained much too restricted and in language which was not only unenlightening to jurors but which might be positively misleading.

In relatively recent times the Rules came under attack by psychiatrists who felt incapable of giving expert testimony in terms of the precise language of the Rules. It is quite uncertain why courts or psychiatrists should have felt that the phrasing of the instructions to the jury, however unfortunate they may have been, restricted the psychiatrists in testimonial descriptions of the mental, emotional and physical condition of the defendant, with full revelation of his deficiencies, for such testimony had been fully developed in *M'Naghten's Case* itself and it has not usually been thought that the lips of expert witnesses were sealed except for the statement of a conclusionary opinion phrased in the precise terms in which the ultimate issue was to be submitted to the jury. To the extent, however, that judges thought that the phrasing of the instructions limited inquiry during the trial into the whole nature of the defendant, there was a compelling reason for revision of the phrasing.

Under those circumstances, the decision of the District of Columbia Circuit in Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, was a significant contribution. It broke the shackles of the prevailing formalism, and its message of reformation fell on fertile ground.[10] With its cheering chorus of approbation, it was a clarion call for judicial reassessment of notions too long held uncritically and of a verbal formalism too long parroted.

Nevertheless, that first great judicial effort of the Twentieth Century to recast the governing rule itself ran into difficulty. Phrased in terms of the act as a product of mental disease or defect it was readily understood by psychiatrists, but it was subject to misinterpretation as prescribing a diagnostic, rather than a moral or societal, test. Moreover, it posed very substantial problems for a jury in grasping its province and discharging its responsibility when faced with psychiatric testimony that the defendant suffered from a condition, classified by psychiatrists as a mental disease, and that the act, in the opinion of the psychiatrists, was the product of the disease in the sense that the defendant would probably not have committed the act had he been a normally oriented and adjusted person. The problem is illustrated by Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 860 (Burger, J., concurring), and it led the District of Columbia Circuit to redefine its use of the terms mental disease and mental defect to limit them to one which "substantially affects mental or emotional processes and substantially im-

---

8. State v. Pike, 49 N.H. 399 (1869).

9. Parsons v. State, 81 Ala. 577, 2 So. 854 (1877).

10. See, e. g. Sobeloff, From McNaghten to Durham and Beyond, 41 A.B.A.J. 793 (1955), 15 Md.L.Rev. 93 (1955).

pairs behavior controls." [11] More recently in Washington v. United States, D.C.Cir., 390 F.2d 444, it took steps to restrict the use by medical witnesses of conclusionary terms and labels in order more effectively to expose the defendant's personality in language understandable by jurors and to avoid confusion when witnesses used legally defined terms in diagnostic meanings at variance with the legal definitions.

■ A year before *Durham* the American Law Institute began a study of the problem. After extensive consideration, with the aid of suggestions from many scholars, it finally adopted its proposal in 1962 as a part of its Model Penal Code. It is phrased in these measured words:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) The term 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

The American Law Institute's formulation has achieved wide acceptance. Some Courts of Appeals have adopted it exclusively,[12] another approvingly but not rigidly,[13] still others with prescribed variations which subordinate the cognitive portion of the problem [14] or satisfy semantic preferences.[15] It substantially meets all of the criticism of the old rules and remedies their presently apparent deficiencies. It avoids the misunderstandings inherent in an undiscriminating use of the *Durham* prescription. For the present, for indiscriminate application, it is, in our opinion, the preferred formulation. With appropriate balance between cognition and volition, it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility.[16] Its verbiage is understandable by phychiatrists; it imposes no limitation upon their testimony,[17] and yet, to a substantial extent, it avoids a diagnostic approach and leaves the jury free to make its findings in terms of a standard which society prescribes and juries may apply.

We ought not fall into the egregious error of the last century, however. Approval of any standard or form of in-

---

11. McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847, 851. There was a similar limitation in New Hampshire of *Pike*. In State v. Jones, 50 N.H. 369 (1871), it was said that if the defendant could control his conduct, his will assented to it, and the act was not caused by his mental disease.

12. United States v. Shapiro, 7 Cir., 383 F. 2d 680; United States v. Freeman, 2 Cir., 357 F.2d 606.

13. Pope v. United States, 8 Cir., 372 F.2d 710.

14. United States v. Currens, 3 Cir., 290 F. 2d 751.

15. Wion v. United States, 10 Cir., 325 F.2d 420.

16. See Hall v. United States, 4 Cir., 295 F.2d 26.

17. We are not now called upon to consider the problem of the use by expert witnesses of diagnostic labels and conclusionary medical terms, which the District of Columbia Circuit has sought to ban. Washington v. United States, D.C.Cir., 390 F. 2d 444. We may notice, however, the obvious importance of great care on the part of court and witnesses to see that such labels and terms, whenever they are used, are explained to the jury to the end that the jury is given a full picture of the defendant's personality in language which jurors may understand. Attempts to elicit from expert witnesses conclusionary opinions in terms of the court's prospective definition of legal responsibility should also be avoided. The expert witness will be most helpful if he limits himself, and is limited to the field of his special competence, fully disclosing the personality of the defendant, and leaving to the court and the jury the problem of application of the legal standard to the kind of person the testimony reveals the defendant to be.

struction need not, and should not, freeze the language or solidify thought. In formulating specific instructions to a jury or the standards which control a court's findings, the particular circumstances of the case may not be disregarded, and the issue as framed by the testimony may require changes in the choice of words. We avoided the imposition of rigid formulas in *Hall*,[18] and we prescribe none now. There should be room for adaptation to the exigencies of particular cases and still larger room for constructive innovation and improvement. We embrace today's advances, but we abjure any formalistic approach which might foreclose variation. We should not prescribe for invariable use a form of words which may be less appropriate than another in the light of the testimony in a particular case and which might tend to live on long after more rational solutions have been uncovered.

In short, while our approval of the American Law Institute's formulation is unequivocal and unreserved, we proscribe no other form of words which may appear more appropriate in a given case now or in cases generally in the future.

That changes will come in the future is both desirable and certain. One change is an immediate imperative.

When the inhumanity of the state's visitation of punishment upon a mental defective, who was not morally censurable for his conduct, was first recognized, the only apparent alternative to punishment was release. For society,

that alternative is unhappy, and frequently it is so for the defendant. A man like M'Naghten ought not to be released with its great risk that he would again resort to violence upon those whom he fancied his persecutors. Nor should he be left untended in the misery of his oppressive delusions, if institutional care with psychiatric and psychological services may assist him. The current debate, therefore, has posed the issue not in terms of confinement or release, but in terms of the kind of institutional care the defendant should receive and its duration.

Achievement of that objective makes essential prompt provision for federal commitment of a defendant acquitted in a District Court on a defense of irresponsibility. There is a statute providing for such commitment in the District of Columbia,[19] but there is doubt, at. least, that it applies to defendants tried outside the District of Columbia.[20] That doubt should be quickly resolved, for there is no other provision in the federal system for the commitment of such persons. The states have been cooperative, but as our population becomes more and more mobile and many individuals more and more stateless, the number of instances in which no state will undertake the burden of subsequent civil commitment proceedings will inevitably be multiplied. The necessity of avoidance of these difficulties can best be served by prompt congressional attention to make the statute clearly applicable to defendants called for trial

---

18. Hall v. United States, 4 Cir., 295 F.2d 26.

19. 24 U.S.C.A. § 211. The statute has been interpreted by the District of Columbia Circuit as authorizing automatic commitment only for the purpose of study and observation and a subsequent report, after which, borrowing from the Hospitalization of the Mentally Ill Act of 1964, D.C. Code §§ 21–501 to 591 (1967), there may be a federal civil commitment hearing. Bolton v. Harris, D.C.Cir., 395 F.2d 642 (decided February 16, 1968). Any statute extending the commitment authoriza-

tion to the general federal jurisdiction should provide an appropriate procedure for federal commitment of such persons and for their ultimate release when they are no longer dangerous by reason of their mental condition to themselves or society. See Bolton v. Harris, supra, this note; Tydings, A Federal Verdict of Not Guilty By Reason of Insanity and a Subsequent Commitment Procedure, 27 Md.L.Rev. 131 (1967).

20. 1881, 17 Op.Atty.Gen. 211. See, however, Pollard v. United States, 6 Cir., 282 F.2d 450 and 285 F.2d 81.

in any District Court and to provide an appropriate procedure.[21]

That other changes will come with the future is readily apparent in the imperfection of our present resolution. Endorsement of the American Law Institute formula solves some problems. It is an advance toward the avoidance of retributive incarceration of those not morally responsible for their conduct and toward assuring for them institutional care with psychiatric and related services. It is far from complete assurance that those in federal custody in need of treatment will receive it. Many defendants who are criminally responsible need psychiatric care and guidance, and many of those may be far better prospects for substantial improvement and complete rehabilitation than most of those found to be criminally irresponsible. Some of the criminally irresponsible will be beyond the capacity for help by medical and related sciences in their present state of development, but if public hospitals are required to accept those for whom they can offer only custodial services, prisoners needing hospitalization may be denied it. Resolution of the question of criminal responsibility, therefore, by whatever standard, is far from a perfect means of assuring the kind of institutional care each defendant should receive.

The ideal solution, perhaps, would be to exclude the question of criminal responsibility from the trial, leaving to penologists the answers to the question of criminal responsibility, with leave to record the court's commitment as criminal or civil depending upon the answer to that question, and to the questions of the kind and duration of the custodial care and treatment he receives.[22] Such an arrangement would afford an opportunity for the answers to come after the development of a much fuller, more reliable record upon more thorough psychiatric and psychological testing. Unfortunately, penology, psy-

chiatry and psychology have not advanced to the point that penologists would welcome such responsibilities or that Congress and judges would willingly entrust them to them.

Meanwhile, it may be recognized that a jury is not the most appropriate instrument for the resolution of these problems. As representatives of society, jurors, under the court's instructions, may appropriately exercise a judgment as to a defendant's moral accountability, but they have no demonstrated capacity for answering diagnostic questions or those involved in prescribing the kind of institutional care a defendant should receive. Moreover, the latter question seems inappropriate for an answer on a record made in a trial on criminal charges when the defendant need not testify and may exclude much evidence relevant to the question. The judge, on the other hand, is experienced in making considered recommendations as to the nature and duration of institutional care, and he may avail himself of the decided advantages of pre-sentence reports by probation officers and thorough clinical studies under such provisions as 18 U.S. C.A. § 4208(b).

There would seem to be, therefore, a wide range for consideration of revisions in our procedures and possible recasting of the questions in order to serve better the ultimate humanitarian purposes of society. For the present, however, we move within the existing framework of the law with awareness that no judicial response to the problem today is perfect and need not endure beyond the availability of more acceptable solutions.

### The Specific Contentions

The defendants here found their appeals upon contentions that we should adopt a strained interpretation of *Durham* without reference to the gloss of *McDonald* and *Washington*. Each defendant, it is said, suffers from a mental or emotional abnormality which psy-

21. See United States v. Freeman, 2 Cir., 357 F.2d 606, 625.

22. See Wion v. United States, 10 Cir., 325 F.2d 420, 428–430.

chiatrists classify as a disease and neither would probably have committed the act charged in the indictment had there been no such disease. In essence, the contention is that each should be held not criminally responsible for each is the kind of person who, under provocation, might commit the kind of offense charged.

The criminal law exists for the protection of society. Without undue harm to the interests of the society it protects, it can exclude from its moral judgments those whose powers of intellect or will are so far impaired that they have no substantial control of their conduct. It can afford, too, elimination of the last vestiges of the notion of punishment for punishment's sake and a further implementation of the principles of rehabilitation, deterrence and, wherever necessary, the ultimate isolation from society of those individuals who have no capacity for the adjustments necessary to conform their conduct as active members of a free society to the requirements of the law. The law may not serve its purpose, however, should it embrace the doctrines of determinism. Should the law extend its rule of immunity from its sanctions to all those persons for whose deviant conduct there may be some psychiatric explanation, the processes of the law would break down and society would be forced to find other substitutes for its protection. The law must proceed upon the assumption that man, generally, has a qualified freedom of will, and that any individual who has a substantial capacity for choice should be subject to its sanctions. At least, we must proceed upon that assumption until there have been devised more symmetrical solutions to the many faceted problems of society's treatment of persons charged with commission of crimes.

We reject the defendants' contention. It is inconsistent with the true meaning of *Durham*, as demonstrated by *McDonald* and *Washington*, and with the express language of the American Law Institute's formulation, including the caveat, which we approve.

Unlike the Leister case in which there were amply supported findings in terms of the American Law Institute test, there were no such explicit findings in the Chandler case. The court, to which the case was tried without a jury relying on our decision in *Hall*, couched its findings in terms of M'Naghten and irresistible impulse. In finding that Mrs. Chandler's act was not an irresistible impulse, however, the court noted that the act was done in the heat of sudden anger produced by the pain and indignity of her husband's kick and that it was the typical case of voluntary manslaughter. It acted upon a record devoid of evidence that Mrs. Chandler lacked substantial capacity to control her conduct. The most that can be said on this record is that Mrs. Chandler is more inclined to overreaction under the stress of anger than the average person, a statement which probably could be made of anyone who commits the crime of voluntary manslaughter. Indeed, on this appeal, it is not contended that she is mentally irresponsible under the American Law Institute test, which we adopt; it is only contended that she is not responsible under a misconstruction of *Durham*, which, as we have noted, has been expressly rejected by the District of Columbia Circuit in *McDonald* and *Washington*. Under the circumstances, it appears unnecessary to remand the Chandler case for additional findings.

The convictions are affirmed.

Affirmed.