### UNITED STATES of America
### v.
### Joseph James McGIRR.
### Crim. No. 27932.

United States District Court,
D. Maryland.

Jan. 13, 1971.

George Beall, U. S. Atty., and Paul M. Rosenberg, Asst. U. S. Atty., Baltimore, Md., for the Government.

William L. Kaplan (court-appointed), Hyattsville, Md., for defendant.

HARVEY, District Judge:

Joseph James McGirr, defendant herein, has been charged with bank robbery in a three count indictment returned by the Grand Jury for the District of Maryland.[1] Pursuant to a formal waiver filed by McGirr, his case came on for trial before this Court sitting without a jury.

The only issue before the Court at trial was whether McGirr on September 30, 1966 was mentally competent under the American Law Institute test for criminal responsibility which has been adopted in this Circuit. United States v. Chandler, 393 F.2d 920 (4th Cir. 1968). Indeed, a stipulation was entered into between counsel and approved by McGirr, in which he admitted all of the essential elements of the offenses charged in all three counts of the indictment.

As approved in the *Chandler* case, the A.L.I. test for criminal responsibility is as follows:[2]

"(1) A person is not responsible for criminal conduct if at the time of such

---

13. We need not and do not decide whether Supreme's corporate form should be disregarded for all purposes.

1. All three counts charged offenses under 18 U.S.C. § 2113(a), (b), (d) and (g). Count 1 charged McGirr with taking $2221.00 from Boulevard Savings and Loan Association, Baltimore County, Maryland, on September 30, 1966 by force and violence and by intimidation. Count 2 charged larceny of the same amount

from that institution, and Count 3 charged that McGirr, in committing these offenses, assaulted employees of the Savings and Loan Association and placed their lives in jeopardy by pointing a sawed-off shotgun at them.

2. All of the federal Circuits have now approved the A.L.I. test except for the First, the Third and the District of Columbia Circuits. See Wade v. United States, 426 F.2d 64 (9th Cir. 1970). The

conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

As the Fourth Circuit said in *Chandler, supra*, at page 926, the A.L.I. test "demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility." Clearly the evidence produced on behalf of the defendant here was sufficient to make the defendant's sanity a jury issue (or one for the Court sitting without a jury) and to place the burden on the government to prove the fact of sanity beyond a reasonable doubt. Hall v. United States, 295 F.2d 26 (4th Cir. 1961).

To assist in resolving the conflict in the expert testimony presented, a full recounting is necessary of the defendant's history and background, including his involvements in other criminal prosecutions in this and other courts. McGirr was born on November 25, 1936 and was therefore 29 years of age when he robbed the Boulevard Savings and Loan Association. He was the youngest of four children in a stable and cohesive family which lived in Richmond Hill, Jamaica, New York. Whatever diagnostic label might be applied to McGirr's later emotional difficulties, they were not the product of economic deprivation but, if anything, resulted from the fact that he was supplied with too many material benefits. His father was a printer whose financial standing was well above the average and who had a good reputation in the community. As defendant was somewhat younger than the other children in the family, his parents over-indulged him, and in many ways he was treated as an only child. He was used to having and spending large amounts of money.

McGirr attended Catholic primary schools, but it was not until high school that he began having trouble conforming to acceptable norms of behavior. At age 14, he stole his father's car together with some money and drove from New York to Florida. He was gone for several weeks but no charges were ever placed against him for this offense. In his junior and senior years of high school, he was a serious truant and, although an average student, failed a number of courses which were later made up by summer study.

Following graduation from high school, he worked in his father's printing business for several years, earning a good salary which he was permitted to spend on his own personal pleasures. However, he resented his father's authority, and on March 8, 1955 he enlisted in the Air Force for a term of four years principally to remove himself from his father's influence and authority.

McGirr found it even more difficult to adjust to military discipline, and he reacted by involving himself in various types of criminal activity. In September, 1955, he was arrested in the District of Columbia and paid a fine of $50, after being charged with disorderly conduct. In April, 1956, charged with grand larceny in New York State, he pleaded guilty to stealing a 1955 Chevrolet at the Belmont race track. As a youthful offender under New York law, he received an indeterminate sentence, which was suspended, and he was released to the military authorities. Shortly before this offense, he had been court-martialed on charges of striking another airman and drawing a firearm unnecessarily.

On November 26, 1956, he was arrested and charged in federal court in the District of Columbia with stealing a car that

First Circuit has not had the opportunity to reconsider the M'Naghten rules since Amador Beltran v. United States, 302 F.2d 48 (1st Cir. 1962). The Third Circuit test was enunciated in United States v. Currens, 290 F.2d 751 (3d Cir. 1961), and the District of Columbia Circuit test was first stated in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).

had been missing from Charlestown race track, Charlestown, West Virginia, for over one month. A psychiatric evaluation made at this time indicated that McGirr was then of sound mind but that he possessed a deep-seated resentment of authority. Following his conviction, he received an indeterminate sentence under the Federal Youth Correction Act on May 17, 1957 and was sent to the Federal Correctional Institution at Ashland, Kentucky. He had theretofore received an undesirable discharge from the Air Force. Following his release from Ashland in 1958, he returned to New York and resumed working for his father as a printer.

In June, 1959, at the age of twenty-two, McGirr was married. From the time of his marriage until about 1963, there is no indication that he engaged in any kind of criminal activity, and he held a steady job during this period. Three children were born during this time, and McGirr and his wife had moved meanwhile to Arlington, Virginia, where he was employed as a printer earning from $12,000 to $18,000 a year. At the time that his third child was born, he had bought a $20,000 house in Bowie, Maryland. However, commencing in 1963, he devoted more and more of his time to gambling activities, to attending the race track and to playing golf. As a young boy, he had learned the game at a private club in New Jersey where he had often gone with his parents during the summer, and he had always been an accomplished golfer. In time, McGirr stopped working and supported himself by his gambling activities and by crime.

Beginning in 1965 and continuing until 1968, McGirr involved himself in various types of serious crimes, including the bank robbery offense now before the Court, three other bank robberies in Maryland which have resulted in indictments in this Court, a counterfeiting offense which has been the subject of litigation in this Court and in the United States Court of Appeals for the Fourth Circuit and highjacking and other offenses which resulted in an indictment and trial in the United States District Court for the District of Columbia. A detailed recounting of the involved history of these other cases is necessary here, as the events that transpired in these interrelated prosecutions are pertinent to the issue presently before the Court.

On June 2, 1966, McGirr was arrested by Secret Service agents when he tried to sell $20,000 in counterfeit bills to an agent. An indictment was returned on October 4, 1966 charging McGirr and a co-defendant, Paul K. Riffle, Jr., with counterfeiting. After arraignment, McGirr and his attorney conferred with government counsel and supplied the government with information concerning other individuals who were involved in this counterfeiting scheme. As a result of these conversations, the original indictment in Criminal No. 27467 was dismissed by the government, and a superseding indictment was returned on June 13, 1967 charging McGirr and five other defendants with various counterfeiting offenses.[3] Included among the defendants named in some of the counts of this indictment was Leonard S. Fentress. An agreement had been reached between government counsel and McGirr whereby the latter would plead guilty to the conspiracy count in this case and would cooperate with the government, including testifying at the trial of the other defendants if necessary. In return, the government agreed to dismiss the other substantive counts in the superseding indictment and further agreed to recommend that a sentence not to exceed four years be imposed under 18 U.S.C. § 4208(a) (2).

On June 16, 1967, McGirr appeared before Judge Thomsen of this Court and pleaded guilty to the conspiracy count of the indictment in Criminal No. 27692. Thereafter, the case against the co-defendant Fentress came on for trial be-

---

3. The superseding indictment was filed as Criminal No. 27692 and contained six counts. McGirr was the only defendant named in every count.

fore the undersigned judge and a jury. McGirr appeared as the first witness for the government on February 5, 1968. He testified in detail as to his part in the counterfeiting conspiracy which began in February, 1966 and was terminated in June, 1966 with his arrest. Fentress was the financier of the counterfeiting operation while McGirr, with his printing experience, was responsible for the purchase of a printing press and paper and the actual manufacture and distribution of the counterfeit currency. Considerable care had been taken by McGirr and Riffle to produce an acceptable product, including the purchase of special paper and the processing of the counterfeit bills with vacuum cleaner dust to give them the proper color. McGirr testified in that case that after the press was purchased, it was taken to Fentress's place of business which was a used car lot and repair shop. It was there that the press was operated during the evening hours and the counterfeit money produced.

Fentress was convicted by the jury and was sentenced to 7 years imprisonment. His conviction was later affirmed by the Fourth Circuit Court of Appeals. United States v. Fentress, 405 F.2d 501 (4th Cir. 1969), cert. denied 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969).

Shortly before he appeared in court to testify in the *Fentress* case, McGirr was charged with four separate Maryland bank robberies in indictments filed in this Court on January 16, 1968. One of these indictments charged the offense involved in this case which occurred on September 30, 1966. In Criminal No. 27933, McGirr was charged with using a sawed-off shotgun in the robbery of the Silver Hill Office of American National Bank of Maryland in Prince George's County on July 19, 1966 of $3,987. The charge in Criminal No. 27934 was that he robbed the Rolling

Road Office of the Union Trust Company in Baltimore County of $9,710 on January 26, 1966, again using a sawed-off shotgun. In Criminal No. 27935, McGirr was charged with robbing the Dodge Park Branch of the American National Bank in Prince George's County of $4,453 on November 17, 1965, also by means of a sawed-off shotgun. When he took the stand in this case, McGirr in effect admitted committing those three bank robberies as well as the one involved in the trial of this case.[4]

Various post-indictment motions were thereafter filed on McGirr's behalf in the bank robbery cases, including a request that he receive a psychiatric examination. On November 4, 1968, McGirr was admitted to St. Elizabeth's Hospital in Washington, D. C. for a psychiatric examination that had been ordered by this Court on October 1, 1968. He remained in St. Elizabeth's until March 14, 1969. As a result of McGirr's examination on this occasion, the Superintendent of St. Elizabeth's wrote a letter dated February 7, 1969 to the Bureau of Prisons which stated in part the following:

"Mr. Joseph J. McGirr was admitted to this Hospital on November 4, 1968, from the United States District Court for the District of Maryland, for mental observation and examination.

"Mr. McGirr has been observed and examined by qualified members of our psychiatric staff and on February 5, 1969, he was examined and his case reviewed in detail at a Medical Staff Conference. As a result, it is our opinion that he is an Antisocial Personality and was so at the time of the alleged offenses, at which times he was able to appreciate the criminality of his act, but he was not able to conform his conduct to the requirements of the law.

"It is further our opinion that he is competent for trial by virtue of having

---

4. When asked by his attorney to describe what happened to the money taken in this bank robbery, McGirr replied that the explanation would require his also telling "what happened to the money from all

of these bank robberies." He then related how he had placed all this money above the damper in the fireplace in his home and how a considerable portion had inadvertently burned up.

a rational as well as a factual understanding of the proceedings against him and being able to consult with counsel with a reasonable degree of rational understanding."

Thereafter, the government requested this Court to appoint a private psychiatrist to examine McGirr, and on May 1, 1969, this Court ordered that McGirr be examined by Dr. William N. Fitzpatrick, a Baltimore psychiatrist. Following a hearing in open court on September 19, 1969, an appointment was arranged for October 2, 1969, but defendant refused to permit Dr. Fitzpatrick to interview him. Subsequently, counsel for McGirr did arrange for examination by Dr. Leonard M. Rothstein, another private psychiatrist in Baltimore. Dr. Rothstein examined McGirr on December 1, 1969 and later testified at the trial.

Meanwhile, McGirr filed a motion seeking to withdraw his plea of guilty in the counterfeiting case so that he could raise the defense of insanity in that case also. Following a hearing, Judge Thomsen denied such motion on October 1, 1969. An appeal was thereupon taken to the Fourth Circuit Court of Appeals.[5] In United States v. McGirr, 434 F.2d 844 (4th Cir. November 24, 1970), the Fourth Circuit held that Judge Thomsen had abused his discretion in denying McGirr's motion to withdraw his guilty plea in that case and remanded the case to this Court for further proceedings.[6] In the concluding paragraph of such opinion, Judge Winter said this:

"We do not decide that McGirr was insane under the A.L.I. test. Whether this conclusion by the doctors at St. Elizabeth's Hospital should be accepted was manifestly a jury question, particularly since only slight evidence of insanity is necessary to cast the burden of proving sanity upon the prosecution and to take the issue of sanity to the jury. Hall v. United States, 295 F.2d 26 (4 Cir. 1961)."

McGirr had also been involved in criminal proceedings in the District of Columbia. In an indictment returned in the United States District Court for the District of Columbia, he was charged with interstate highjacking and various other offenses which allegedly occurred on August 27, 1968. Criminal No. 1620–68. A motion filed by the government in that case for another mental examination was opposed by McGirr. Following a hearing, Judge Walsh granted the motion, and McGirr was again confined at St. Elizabeth's Hospital and examined between February 19, 1970 and March 17, 1970. In a report to the Court dated March 13, 1970, the Acting Superintendent (through Dr. Elizabeth R. Strawinsky) said the following:

"Joseph James McGirr was admitted to Saint Elizabeths Hospital on February 19, 1970, for mental observation and examination in the above-mentioned criminal number.

"Dr. Robert H. Robertson, a qualified member of our psychiatric staff, recently examined Mr. McGirr and the following determinations have been made. He has been diagnosed as Dyssocial Behavior (No Mental Disorder) and is competent for trial by virtue of having a rational and factual understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding. Furthermore, on or about August 23, 1968, the date of the alleged offenses, he was not suffering from a mental disease or defect and the alleged offenses, if committed by him, were not the product of an abnormal mental condition.

"He is not receiving psychotropic medication."

The District of Columbia case came on for trial before a jury on April 28, 1970. On May 1, 1970, the jury returned a verdict of not guilty on three of the counts (armed robbery, kidnapping and assault

---

5. The decision in this case was held *sub curia*, pending the filing of the opinion in that appeal.

6. Judge Winter wrote the majority opinion and Judge Boreman dissented.

with a dangerous weapon) and not guilty by reason of insanity on the other four counts (robbery, unauthorized use of a vehicle, interstate transportation of a stolen motor vehicle, and interstate transportation of stolen property). Some of the same witnesses who testified in the District of Columbia trial also testified before this Court when the present case came on for trial on May 20, 1970. McGirr's attorney relies heavily on the finding of insanity by the District of Columbia jury in support of his argument that McGirr was not legally responsible for the acts which led to his indictment in the pending case.

In the light of these background facts, this Court will now undertake to resolve the direct conflicts in the expert and other testimony presented in this case. At the trial, the government called five psychiatrists and two lay witnesses, while five psychiatrists, one general physician, one psychologist and two lay witnesses, including McGirr himself, testified for the defendant. The central issue in this case is not concerned with the cognitive part of the A.L.I. test, as the psychiatrists almost uniformly agreed that defendant understood the criminality of his conduct.[7] The real dispute here concerns the volitional part of the test, namely, whether at the time that McGirr robbed this savings and loan association he lacked substantial capacity to conform his conduct to the requirements of law.

The psychiatrists called by the government diagnosed McGirr's condition as "dyssocial behavior" or "antisocial personality." They concluded that at the time of this offense he was not suffering from a mental disease or defect and further that he could conform his behavior to acceptable norms. The defendant's experts on the other hand found McGirr to be suffering from "latent schizophrenia," or found him to be an "antisocial personality, severe degree" or to have a "sociopathic personality rather severe."[8] They were of the opinion that McGirr was suffering from a mental disease or defect, and they concluded that he could not conform his conduct to the law even though he knew when he robbed this financial institution that his acts were criminal.

Essentially then there are two questions before the Court arising under the A.L.I. test, namely (1) whether McGirr's psychiatric condition could be properly termed a mental disease or defect, and (2) whether because of such disease or defect he lacked substantial capacity at the time he committed this offense to conform his conduct to the requirements of the law. In view of this Court's finding concerning the second issue, it is not necessary to resolve the first.[9] For the purposes of this case, it will be assumed that McGirr's psychiatric condition could properly be termed a mental disease or defect within the meaning of the A.L.I.

---

7. Nor did the government or its experts here contend under paragraph (2) of the test that in McGirr's case any mental disease or defect was manifested only by his repeated criminal conduct. Paragraph (2) has been criticized as failing to achieve its purpose and failing to establish any meaningful test. See Wade v. United States, *supra*, 426 F.2d at page 72.

8. As pointed out in footnote 17 in the *Chandler* opinion, (*supra*, 393 F.2d at page 926), diagnostic labels and conclusionary medical terms are meaningless in the absence of a full explanation in terms of the particular defendant himself. "The expert witness will be most helpful if he limits himself, and is limited to the field of his special competence, fully dis-

closing the personality of the defendant, and leaving to the court and the jury the problem of application of the legal standard to the kind of person the testimony reveals the defendant to be." (393 F.2d at 926.)

9. The testimony was conflicting as to whether an individual with a "sociopathic personality" suffered from a mental disease or defect. Dr. Strawinsky, a government witness, found defendant to be suffering from "dyssocial behavior," a condition without manifest psychiatric disorder. However, on cross-examination she conceded that the condition of sociopathic personality did involve "some sickness" and therefore might be a mental disease to some degree.

test. However, this Court finds that the evidence in the case establishes beyond a reasonable doubt that on September 30, 1966, the defendant, Joseph James McGirr, did not lack substantial capacity to conform his conduct to the requirements of the law. The most that might be said in support of the defendant's position in this case is that his capacity to conform his conduct to the requirements of the law may have been diminished slightly but not to such an extent that he did not have a substantial capacity for choice.

In making this finding, this Court accepts the expert testimony of Doctors Robertson, Weickhardt, Rothstein and Strawinsky, as supported by that of Dr. Fitzpatrick. The opinions stated by these experienced and well qualified psychiatrists were more consistent with the defendant's background and with the other facts in this case than were the opinions expressed by defendant's expert witnesses. Drs. Robertson, Weickhardt and Strawinsky had all been on the staff at St. Elizabeth's Hospital, Washington, D. C., for many years when they examined defendant in March, 1970. Each of these psychiatrists had extensive experience in diagnosing and treating the mental conditions of individuals charged with committing criminal acts. They found McGirr to be suffering with "dyssocial behavior", a diagnostic label applied to individuals who cannot be classified as antisocial personalities but who are predatory and inclined to follow criminal pursuits.[10]

Even greater weight must be given to the testimony of Dr. Leonard M. Rothstein, a psychiatrist in private practice in Baltimore. Board-certified and a member of the American Psychiatric Association, Dr. Rothstein examined McGirr at the request of his attorney and also consulted with defendant's parents.

Before testifying in this case, he had reviewed all the records of St. Elizabeth's Hospital as well as the transcribed testimony of the various psychiatrists who had been called to testify at the trial in the District of Columbia. Dr. Rothstein concluded that McGirr was an antisocial personality who was substantially able to conform his conduct to the requirements of the law. According to this witness, McGirr was hedonistic and committed crimes to gain money and to secure approval and esteem from others in his group.

Arrayed against the convincing testimony of the psychiatrists who testified for the government, little weight can be given to the experts who testified on behalf of the defendant. Dr. Murkofsky, who was not a psychiatrist, was a young physician who had been out of medical school for only a little over one year when he examined defendant in 1968. He obviously liked defendant, and his bias in defendant's favor was quite apparent from his testimony. Dr. Bauer was a clinical psychologist who administered psychological tests to defendant at St. Elizabeth's Hospital. None of the other experts concurred in Dr. Bauer's conclusion that defendant had a "multiple personality," and this witness admitted that he was not familiar with the A.L.I. test of insanity.

Four of the five psychiatrists who testified for defendant diagnosed his condition as latent schizophrenia. They based their conclusions in this respect on their assumptions either that McGirr was a person with a "flat affect" or that he showed looseness of thinking, or both.[11] Furthermore, Dr. Hamman's diagnosis of "sociopathic personality, rather severe" was likewise based on his belief that McGirr had a flat affect.

All of these expert opinions must be rejected, for the factual basis for such

---

10. Dr. Weickhardt was not completely satisfied with the term "dyssocial behavior" which he called a kind of statistical pigeon-hole. He found it more accurate to say that defendant was without mental disorder.

11. A person with a "flat affect" is one who shows little emotional reaction to different situations. One witness described such a person as one whose emotional needle did not move very far in either direction.

opinions has no support in this record. The evidence in this case clearly establishes that rather than a flat affect, defendant's affect was quite normal. It is clear that he was not a person with a marked lack of feeling but rather showed various emotional reactions to different situations. The witness Phillip Smith was a close social friend of McGirr who played golf with him and saw him often during the period from March, 1964 to June, 1966. Smith testified to McGirr's occasional quick temper, particularly on the golf course, and noted only normal fluctuations in his mood and temperament. Donald F. Rogers, one of the attorneys for defendant who retired from the case at defendant's request, testified that in his contacts with defendant the latter had shown normal emotions. Finally, this Court had occasion to see and hear defendant and to observe his reactions at various different times before the actual trial of this case.[12] Defendant testified at length in the *Fentress* case before this judge, and participated in various pre-trial motions which were likewise heard by the undersigned.[13] At times defendant was quite excited and at times he was subdued. During the pre-trial period his range of emotions was quite normal for one appearing as a witness and a defendant in a federal court, and he showed the Court an affect quite different from the one he apparently displayed to some of the psychiatrists during their brief interviews. This Court accepts the testimony of Dr. Strawinsky who characterized defendant's affect as being "guarded" rather than "flat." Based on the record as a whole, the finding is that defendant was not possessed of a flat affect at the time he was examined by the experts who testified in his behalf in this case.

Nor does the record indicate that McGirr suffered from looseness of thinking. Dr. Leon Yochelson was the witness who relied most heavily on such a finding to support his opinion. Dr. Yochelson made a verbatim transcription of his interview of McGirr on April 7, 1970. He asked McGirr to "explain the difficulties you have been in" and recorded the somewhat disjointed response. Undoubtedly, McGirr's inarticulate reply to this difficult question now appears to have been not well organized and is not easily understood, particularly when subjected to the detailed and microscopic examination which counsel and various experts have given it. But it goes too far to say that McGirr was affected with "looseness of thinking" when he failed to respond succinctly and accurately to a question which amounts to a statement of the basic issue in this case and which has been answered in various ways by the ten psychiatrists testifying at the trial. The government's witnesses in this case found that McGirr's response to such question provided no significant psychiatric clue to his emotional problems, particularly none that would support a diagnosis of any form of schizophrenia. In his many letters to the Court, in his appearances in Court at the pre-trial hearings and in his lengthy testimony in the *Fentress* case, the defendant's words were properly put together (both orally and in writing), his speech was consistently coherent, and his thinking was well-organized. This Court finds from the record that McGirr, at the time he was examined by his experts, did not suffer from looseness of thinking.

In concluding that McGirr lacked substantial capacity of choice in controlling his conduct, some of the defendant's experts testified that McGirr might well have gone ahead and committed this armed bank robbery even if a policeman had been standing in the bank. Again, the facts in this record support no such conclusion. This crime was planned and executed with great care to avoid detec-

---

12. These occasions were both before and after McGirr's expert witnesses had examined him.

13. In particular, reference is made to the transcript of the proceedings in open court in this case on September 19, 1969 and the affect displayed by McGirr on that occasion which was anything but bland.

tion. A stolen car was used as the getaway vehicle. Before the robbery, McGirr carefully inspected the bank surroundings and entered at the most propitious moment. The sawed-off shotgun he used was carefully concealed in a trench coat which he was holding as he approached the teller's window. He used eyeglasses as a disguise and ordered bank personnel to drop to the floor so that they would not observe the direction or mode of his flight. Finally, the getaway car was abandoned at a large shopping center parking lot, where McGirr transferred to his own automobile to continue his escape undetected.

His actions to avoid detection on the occasion of this bank robbery were completely consistent with the meticulous planning of McGirr and his associates in connection with the counterfeiting conspiracy. Special paper was purchased and treated so that the bills might appear more authentic. The printing press was operated at night at Fentress's used car lot, and before undertaking to distribute their product in large quantities, Riffle and McGirr tried out a few of the bills in Atlantic City and New York to see if they would be acceptable. None of these facts indicate that McGirr's capacity for choice was so diminished that he would go ahead and commit a crime even if there was a substantial risk of immediate apprehension.

The defendant here committed these crimes not because he could not control his conduct but because he needed money and found criminal activity an easy way to satisfy his financial needs. Dr. Robertson found that McGirr's mental condition would put him in a category "for individuals who are not classified as antisocial personalities but who are predatory in and follow, more or less, criminal pursuits." References in the A.L.I. test to powers of control do not encompass those who do not wish to control and restrain their conduct as contrasted with those whose controls are not governed by their wishes. United States v. Wilson, 399 F.2d 459, 463 (4th Cir. 1968). As the Fourth Circuit said in the *Wilson* case (at page 463):

"As long as an individual has a substantial capacity for choice, he does not escape the law's criminal sanctions because he chooses imprudently or so prefers his immediate self-interests that he is prepared to commit deliberate transgressions *whenever he thinks they will advantage him and that he will not be caught.*" (Emphasis added.)

McGirr was a hedonist who liked the good life and the pleasures associated with it.[14] Spoiled as a youngster and accustomed to having and spending large sums of money, he resorted to crime as an adult for the immediate gratification of his desires. Loans from his father aggregating $13,500 in 1966 and 1967 were not enough to take care of the financial demands of his high scale of living in those years and also the extraordinary requirements of his gambling habits. Indeed, he admitted that on occasion he lost as much as $2,000 to $3,000 at the race track.

Evidence of McGirr's capacity to control his actions is further supplied by his reaction to his marriage. Having married in 1959, he devoted himself during the next four years to his wife and his rapidly growing family. He secured a good job as a printer and devoted his time and energies to supporting his family. There is no indication of any criminal involvement during this period. However, in time the satisfactions of such a life proved too dull for one with McGirr's luxurious tastes. He quit his regular job, spent more and more of his time gambling and playing golf with friends and soon thereafter returned to the criminal activities which had led to his incarceration in 1957 and 1958. In other words, the defendant was quite capable of staying away from crime during these years when he chose to direct his interests towards his newly formed family. But when he decided to quit his

14. As one witness testified, McGirr always "liked to go first class."

printing job and spend more time with his gambling and sporting associates, he also chose to return to criminal activity not only to supply his monetary needs but also for the approval and esteem of his peers. The fact that McGirr did actually *conform* his conduct to the requirements of the law for some four years is evidence that he did not lack substantial capacity to do so at any particular time he chose.

That defendant's conduct was deviant during the years 1965–1968 is more than apparent from the record in this case. But as posed in *Chandler*, the ultimate question here is whether the law should exclude McGirr from its moral judgments because the power he exercised over his will was so far impaired that he had no substantial control over his conduct. This Court thinks not. As Judge Haynsworth said in *Chandler, supra*, 393 F.2d at page 929:

> "The law may not serve its purpose, however, should it embrace the doctrines of determinism. Should the law extend its rule of immunity from its sanctions to all those persons for whose deviant conduct there may be some psychiatric explanation, the processes of the law would break down and society would be forced to find other substitutes for its protection. The law must proceed upon the assumption that man, generally, has a qualified freedom of will, and that any individual who has a substantial capacity for choice should be subject to its sanctions. At least, we must proceed upon that assumption until there have been devised more symmetrical solutions to the many faceted problems of society's treatment of persons charged with commission of crimes."

McGirr's reliance in this case on the jury finding of insanity in the District of Columbia case is misplaced. Under *Durham v. United States*, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), there is an entirely different test of criminal responsibility in the District of Columbia from the one that controls in the Fourth Circuit. A defendant under *Durham* can be found not guilty by reason of insanity if his act were merely the product of a mental disease or defect. As Judge Haynsworth pointed out in *Chandler, supra*, 393 F.2d at page 925, the *Durham* test poses "very substantial problems for a jury" and is "subject to misinterpretation as prescribing a diagnostic rather than a moral or societal test." The Ninth Circuit rejected the *Durham* test because of grave concern over the possibility of entangling causation problems and fundamental policy perplexities in defining the words "product of", "mental disease", and "defect." *Sauer v. United States*, 241 F.2d 640, 646–647 (9th Cir. 1957), cert. den. 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957); *Wade v. United States*, 426 F.2d 64, 69 (9th Cir. 1970).

Furthermore, the evidence presented in the District of Columbia trial was quite different from that before the Court in the pending case. Five witnesses who had not been called in the District of Columbia case testified for the government in this Court. Indeed, at the District of Columbia trial the government called only one expert witness as opposed to five at this trial. This Court concludes that the finding of insanity by the District of Columbia jury, reached under a different legal test and with different evidence before it, is entitled to little weight in this case.[15]

For the reasons stated, this Court finds the defendant guilty as charged in all three counts.

---

15. In United States v. Gray, 429 F.2d 1323 (4th Cir. 1970), there were somewhat similar facts. The defendant in that case had been found not guilty by reason of insanity in the District of Columbia in several criminal prosecutions in which the government had not offered psychiatric testimony in opposition to that elicited on behalf of the defendant. However, a jury in this District rejected his defense of insanity and found the defendant guilty of armed bank robbery. The Fourth Circuit affirmed such conviction.