STATE OF HAWAII, Plaintiff-Appellee, *v.* FREDERICK CHARLES NUETZEL, Defendant-Appellant

NO. 6961

FEBRUARY 15, 1980

RICHARDSON, C.J., OGATA AND MENOR, JJ.,
RETIRED JUSTICE KOBAYASHI AND CIRCUIT
JUDGE LUM, ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY RICHARDSON, C.J.

Defendant-appellant Frederick Charles Nuetzel appeals from his conviction of murder pursuant to HRS § 707-701 following a five-day jury trial. We affirm his conviction.

The facts and circumstances leading to appellant's arrest were presented during the prosecution's case through the testimony of various witnesses. Mrs. Naomi Weigel, property manager of decedent's apartment building testified that appellant resided with decedent, Kenneth Todd, for two weeks prior to his death. On the afternoon of March 18, 1977, Mrs. Weigel noticed a note taped to the front door of decedent's apartment. The note, signed by Kenneth Todd, stated that he had gone to Nanakuli for the weekend and would return the following Monday. On Wednesday, March 23, 1977, Naomi Weigel decided to check Todd's apartment. She was surprised that Todd had not informed her personally of his leavetaking and was worried about him and his dog, whom she could hear from inside the apartment. That evening, using her passkey and accompanied by friends, she entered the apartment and found Todd dead in his bedroom.

The medical examiner, Dr. Alvin Majoska, testified that Kenneth Todd's body contained at least eleven stab wounds to the abdomen, seven small wounds on the back and other various wounds on the neck and head. The major injury,

however, was an incised wound on the left chest which extended through the chest wall, the lung and the pericardium. The wound was such that the decedent's heart was excised almost entirely. The medical examiner's opinion as to Todd's death was "hemorrhage due to excision of the heart." In other words, Todd bled to death as a result of having his heart cut out.

Several police officers testified as to the condition and location of decedent's body on their arrival at the apartment after Naomi Weigel alerted the Honolulu Police Department. Detective Jeffrey H. Yamashita also testified extensively at trial as to the interview he conducted with appellant on March 24, 1977 at the Honolulu Police Department cell block where appellant was being held on another unrelated charge.

Appellant willingly talked to Detective Yamashita[1] and related the following version of events. The incident in question occurred on either March 18th or 19th. Appellant had returned to the apartment around 6:00 p.m. after spending the day at the beach. Todd returned much later at around 11:00 p.m. He had been out drinking with friends and appeared very intoxicated. Both Todd and appellant were seated across from each other at the kitchen table. Suddenly, without any provocation, Todd swore at appellant, grabbed a knife from the table and lunged at appellant with the knife. Simultaneously, appellant picked up a screwdriver that was also lying on the table. He managed to avoid Todd's attack

---

[1] A motion to suppress appellant's statements made to Detective Yamashita on the night of his arrest and a screwdriver recovered as a result of a search of his apartment following his signing a consent to search form was made and heard during the first day of trial on January 30, 1978. Testifying on the motion, appellant and Detective Yamashita both acknowledged that a written consent form was signed and executed by appellant and that a written consent to search the apartment was also signed. There was some conflict in testimony as to whether appellant had been thoroughly informed of his rights before signing the forms. Appellant testified that Detective Yamashita did not inform him of his right to have a lawyer present during the questioning. On the other hand, Detective Yamashita testified unequivocally that he gave the usual warnings including informing appellant that he had the right to an attorney and a right to a public defender if he could not afford one. The court resolved the conflict in evidence in favor of the police officer and concluded that appellant knowingly, intelligently and voluntarily waived his rights in all respects. Consequently, the motion was denied.

and hit Todd's head with the screwdriver. Todd dropped the knife and at this point appellant went into a frenzy, stabbing continuously at Todd. Todd continued to fight back and appellant in turn continued his stabbing. Later, appellant picked up the knife and cut out Todd's heart to make sure he was dead. He covered the body, bathed and changed his clothes. The next day he threw the heart into the downstairs dumpster and placed the handwritten note on the apartment door. On the morning of March 23, 1977, appellant left the apartment for breakfast and a newspaper and later went to the beach. He was subsequently picked up by the police for another offense.

At the close of the state's case, defense counsel moved for a judgment of acquittal which was denied by the trial judge. The greater part of the defense's case included the testimony of four expert witnesses. Dr. Furukawa, the first psychiatrist to examine appellant, initially had been contacted by the Office of the Public Defender to determine whether there were any grounds on which to base a defense of insanity. As a result of the examination, Dr. Furukawa recommended that the court appoint a sanity commission to further interview appellant.[2] At trial Dr. Furukawa also testified as a defense witness and stated that he felt appellant was suffering from paranoid schizophrenia or "paraphrenia" and that his capacity to recognize what he was doing and also to conform his behavior to the law's standards was impaired at least 75%.

Pursuant to a court order, Dr. Presbrey, Dr. Graham and Dr. Lo served on a commission that undertook further exami-

---

[2] HRS § 704-404 governs the procedure for appointment of such a commission. The section provides that the proceedings shall be suspended if defendant has filed a notice of intention to rely on the defense of physical or mental disease or there is reason to doubt his fitness to proceed or reason to believe that the physical or mental disease, disorder, or defect will become an issue in the case. Section (2) of the statute states that the "court shall appoint a State-employed physician or certified clinical psychologist designated by the director of health from within the department of health and two additional unbiased, qualified physicians, or one qualified physician and one certified clinical psychologist and at least one of the physicians appointed shall be a psychiatrist." In the present case the doctors were appointed because there was reason to believe that appellant's mental state would become an issue in the case.

nation of appellant. Dr. Presbrey had examined appellant for fifty minutes and diagnosed him as a "paranoid personality" with "anti-social features," which Dr. Presbrey characterized as a personality disorder. When questioned about the degree of.appellant's impairment, Dr. Presbrey noted that at the time of the offense, appellant's ability to know that what he was doing was wrong was impaired 40% and that his capacity to control himself from wrongdoing was impaired 50%.

Dr. Graham examined appellant for seventy minutes and diagnosed him as a "paranoid personality" with "sociopathic features." When asked to quantify appellant's degree of impairment, Dr. Graham stated that appellant's ability to control himself was "moderately diminished."

The fourth psychiatrist, Dr. Lo, examined appellant for seventy-five minutes, diagnosing him as having a "personality disorder with anti-social and paranoid tendencies." Dr. Lo's conclusion as to appellant's impairment was that it was "minimum to moderate."

The last medical evidence presented was through a medical report written by Dr. Barthel, psychological consultant for the state courts and corrections. Dr. Barthel's report was received into evidence by stipulation in lieu of his testimony. Although his report was very brief, Dr. Barthel concluded that appellant showed no signs of psychoses or loss of control.

After this report was read to the jury in its entirety, defense counsel renewed her motion for a judgment of acquittal which was again denied. Instructions were given to the jury and as a result of its deliberations, a verdict of guilty was returned on February 3, 1978.

The two issues raised on appeal for this court's consideration are:

I. Whether the trial court, at the close of appellant's case, erred in denying the motion for a judgment of acquittal.

II. Whether the trial court erred in its instruction to the jury defining "lack of substantial capacity" as "capacity which has been impaired to such a degree that only an extremely limited amount remains."

I.

Rule 29(a) of the Hawaii Rules of Penal Procedure (1977) states:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses alleged in the charge after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Appellant argues that his motion for judgment of acquittal should have been granted because even after all the evidence had been presented, the prosecution failed to establish the material elements of murder[3] beyond a reasonable doubt. Specifically, appellant argues that his defense of legal insanity pursuant to HRS § 704-400(1)[4] totally negated the necessary criminal intent required to establish penal responsibility.

This court has clearly expressed the constitutional principle that an accused in a criminal case can be convicted only upon "proof by the prosecution of all of the elements of the crime charged against him beyond a reasonable doubt." *State v. Napeahi*, 57 Haw. 365, 372, 556 P.2d 569, 574 (1976). Thus, to secure appellant's conviction, the state had the burden of proving all the elements of murder, HRS § 707-701, beyond a reasonable doubt. But appellant's raising the defense of insanity under HRS § 704-400(1) required the prosecution to prove the additional element of appellant's sanity to establish its prima facie case. According to *State v. Moeller*, 50 Haw. 110, 433 P.2d 136 (1967), at the outset of a case a defendant is presumed to have been sane at the time he committed the offense. However, "if any evidence introduced raises the question of the sanity of a defendant or insanity becomes a

---

[3] These include intentionally and knowingly causing the death of another person.

[4] HRS § 704-400(1) reads:

A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

defense, then the State is required to establish the sanity of the defendant beyond a reasonable doubt." 50 Haw. 121, 433 P.2d at 143, citing *Territory v. Adiarte,* 37 Haw. 463 (1947). *See Davis v. United States,* 165 U.S. 373 (1897). Thus, when defense counsel introduced the testimony of the four psychiatrists as to appellant's allegedly impaired mental state, the burden of persuasion shifted to the State to prove beyond a reasonable doubt that appellant was sane when he committed the offense.[5]

On appeal, the standard for this court in determining whether the motion for judgment of acquittal was correctly denied is whether the evidence, considered most favorably to the government, was such as to permit a rational conclusion by a jury that the accused was sane beyond a reasonable doubt. *United States v. Monroe,* 552 F.2d 860, 864 (9th Cir. 1977); *United States v. Julian,* 440 F.2d 779, 780 (9th Cir. 1971); *United States v. Shackelford,* 494 F.2d 67, 75 (9th Cir. 1974). A close and thorough examination of the evidence adduced at trial as well as a review of the relevant body of law regarding this subject leads to this court's conclusion that the evidence, when viewed most favorably to the government, was such that a reasonably minded juror could fairly conclude that appellant was sane beyond a reasonable doubt.

In resolving this issue, the definition of legal insanity as embodied in HRS § 704-400(1) must be studied. This provision was adopted as part of the Hawaii Penal Code in 1972 and was modeled in great part after the Model Penal Code formu-

---

[5] The order in which the evidence is presented in a case where sanity or insanity is at issue is as follows: First the government presents its evidence; the defendant presents his opposing evidence. Then the government takes the stage again for the presentation of rebuttal evidence. However, where during the presentation of the defendant's case sanity has been put into issue, when the government resumes the active role of presenting evidence, it is not confined to the presentation of "rebuttal" evidence; it has resumed the burden of going forward with the presentation of its case in chief. In these cases it is presenting evidence as to an essential element of the crime, sanity, which it was privileged to skip when it first proceeded. United States v. Manetta, 551 F.2d 1352, 1357-58 (5th Cir. 1977). *See also,* 2 WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 403 (1969).

lation developed by the American Law Institute (A.L.I.).[6] Although this court has not yet had occasion to clearly define its application,[7] the statute is before us with an extensive Commentary that draws heavily from the comments and drafts of the A.L.I. — Model Penal Code. Although the Commentary is not to be taken as evidence of legislative intent, it can be looked to as an aid to interpreting the statutory provision. HRS § 701-105. Furthermore, most of the federal jurisdictions[8] and many state

---

[6] The main difference in the Model Penal Code formulation and the Hawaii formulation is the addition of the words "physical" and "disorder" in the Hawaii test. In adding "physical" the Code seeks to avoid the arbitrary, meaningless and strained distinctions which have been made between excusing conditions which have been labeled "mental" and those which have been labeled "physical." The Chapter provides for a unified treatment of diseases, disorders, and defects which constitute an excusing condition. The same standards are provided for determining whether the condition of the accused will relieve him of responsibility for his act — whether or not the condition is labeled "mental" or "physical" or both. The word "disorder" has been added in an attempt to insure that, regardless of any technical distinctions that may be made according to medical usage, all conditions which impair capacity according to the standard set forth in the formulation will be covered. Commentary to HRS § 704-400(1).

[7] Just prior to 1972, the defense was contained in HRS § 703-4 (1968) which was essentially the M'Naghten Rule from the 1843 English case. And even before the 1968 enactment, the test had been maintained as part of our Penal Code in varying forms since its first adoption in 1850 by Chief Justice Lee. To date, there are only four Hawaii cases on this subject, all decided under the old M'Naghten formulation. Territory v. Alcosiba, 36 Haw. 231 (1942) (defendant relieved of criminal responsibility if the mental derangement under which he acted at the time of offense was caused or was the effect of a disease of the brain rendering him incompetent to discern the nature and criminality of the act done by him); Territory v. Adiarte, 37 Haw. 463 (1947) (presumption of sanity may be rebutted by slight evidence to the contrary by either the prosecution or the defense); State v. Foster, 44 Haw. 403, 354 P.2d at 960 (1960) (sufficiency of evidence of insanity to take case to the jury). In the most recent of the four cases. State v. Moeller, 50 Haw. 110, 433 P.2d 136 (1967), we reiterated the test as "such a diseased or deranged condition of the mental faculties of a person as to render him incapable of knowing the nature and quality of the act he is committing or incapable of knowing the difference between right and wrong in relation to such act." *Id.* at 114, 433 P.2d 139.

[8] United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); United States v. Currens, 290 F.2d 751 (3d Cir. 1961); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968); Blake v. United States, 407 F.2d 908 (5th Cir. 1969); United States v. Smith, 404 F.2d 720 (6th Cir. 1968); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967); United States v. Frazier, 458 F.2d 911 (8th Cir. 1972); Wade v. United States, 426 F.2d 64

courts[9] which have also adopted the A.L.I. — Model Penal Code formulation have applied it to particular fact situations and can be looked to for guidance.

## HISTORY

The Commentary traces the development of the different standards that have been developed to exculpate a defendant from criminal responsibility starting from M'Naghten and moving to the "irresistible impulse" and Durham formulations and finally the A.L.I. — Model Penal Code test. A brief discussion of each of these tests is necessary to a complete understanding of § 704-400(1).

The M'Naghten Rule traces its origin to the English case.[10] Although initially popular in a majority of the states and in the federal circuits, criticism of the rule has been

---

(9th Cir. 1970); Wion v. United States, 325 F.2d 420 (10th Cir. 1963); United States v. Brawner, 471 F.2d 969 (D.C.Cir. 1972).

[9] For a complete list of the state cases and state statutory provisions adopting the A.L.I. — Model Penal Code Test and a list of the states adopting the A.L.I. — Model Penal Code test with some modification, see State v. Johnson, 399 A.2d 469, 475, n.6 (1979).

[10] M'Naghten's Case, 10 Clark & Finnelly 199, 8 Eng. Rep. 718 (1843) was the famous English case in which Daniel M'Naghten shot and killed Drummond, private secretary to Sir Robert Peel, then Prime Minister of England, believing him to be Sir Robert. M'Naghten was labouring under a delusion that he was being persecuted by his enemies and that Peel was one of them. Insanity was asserted as the defense and the medical evidence submitted was that M'Naghten was affected by morbid delusions, carrying him beyond the power of his own control and leaving him with no perception of right and wrong. He was acquitted by a jury who found him to be "not guilty by reason of insanity." The decision caused great controversy stirring the House of Lords to question the fifteen judges of England as to the law governing such a case. The rules that emerged as a result of this discussion have since been known as the M'Naghten Rules: "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." 8 Eng.Rep. at 722. The formulation was used in this country and adopted by some thirty-two states and the federal courts with differing variations.

prevalent in recent years.[11] One objection to the rule is that it singles out only one factor as a test of responsibility — cognition — relying on the defendant's ability "to know" what he was doing or "to know" the wrongfulness of his conduct. This compartmentalization of the mind and its functions ignores the reality that an individual is a complex being with varying degrees of awareness. Fourteen states[12] and the federal jurisdiction recognized this defect in the M'Naghten Rule and supplemented the M'Naghten formula with what has been labeled as the "irresistible impulse" test. This formulation took into consideration the volitional aspects of an individual defendant in that a mental disease, disorder, or defect may produce an incapacity for self-control without impairing cognition. Therefore, this formulation recognized that a defendant whose volitional capacity is impaired as a result of a disease, disorder, or defect should be relieved of penal liability just the same as a defendant whose cognitive capacity is so impaired. However, a criticism of the irresistible impulse test is that it may be restricted to apply only to sudden, momentary or spontaneous acts without recognition of mental illness characterized by brooding or reflection.[13]

More subtle criticisms of both M'Naghten and the "irresistible impulse" formulations are the requirements that the

---

[11] As early as 1838, Isaac Ray, one of the founders of the American Psychiatric Association, called knowledge of right and wrong a "fallacious test" of criminal responsibility. RAY, MEDICAL JURISPRUDENCE OF INSANITY 47 (1st ed. 1838). This view has long since been substantiated by enormous developments in the knowledge of mental life. *See* ZILBOORG, LEGAL ASPECTS OF PSYCHIATRY IN ONE HUNDRED YEARS OF AMERICAN PSYCHIATRY 1844-1944, 507, 522 (1944).

In State v. Moeller, 50 Haw. 110, 433 P.2d 136 (1967), we expressed dissatisfaction with the rule stating: "The rule of criminal responsibility established by Section 249-4 is extremely inadequate and antiquated. It has been in our statute books without change since the compilation of the Penal Code of 1850 by Chief Justice Lee. However, it is part of our statutory law and only the legislature can amend or repeal it." *Id.* at 115-116, 433 P.2d at 140.

[12] Alabama, Arkansas, Colorado, Connecticut, Delaware, Indiana, Kentucky, Massachusetts, Michigan, New Mexico, Utah, Vermont, Virginia and Wyoming.

[13] MODEL PENAL CODE § 4.04, Comment (Tent. Draft No. 5, 1956). *See also* Wade v. United States, 426 F.2d 64, 67 (9th Cir. 1970).

defendant completely lack the capacity for self-control. This legal requirement of total incapacity does not conform with modern medical knowledge or the clinical experience of psychiatrists.[14]

A minority of jurisdictions[15] have adopted a third approach, first set forth in *Durham v. United States*, 214 F.2d 862 (D.C. Cir. 1954). The test relieves an accused from criminal responsibility if his unlawful act was the product of a mental disease or mental defect. The criticisms of this test are twofold: the difficulty of psychiatrists to even determine whether such impulses actually exist and the dangers of leaving the ultimate decision of criminal responsibility to the expert medical witness. Once the expert has decided the issue of causation and that the defendant's condition falls within the categories of "mental disease or mental defect," he must be acquitted. If medical experts have testified that defendant's act was produced by a mental disease or defect, there is no standard by which a jury can determine whether the defendant ought to be held responsible. Commentary to HRS § 704-400; *Wade v. United States*, 426 F.2d 64, 69 (9th Cir. 1970). Thus, the problem with the Durham "product" test is that it gives the medical experts too much control, taking away the function of the jury who should ultimately determine criminal responsibility.

---

[14] Many persons with a mental disease, disorder, or defect may have an extremely limited capacity for self-control or cognition, but their lack of capacity is rarely total. The schizophrenic, for example, is disoriented from reality; the disorientation is extreme; but it is rarely total. Most psychotics will respond to a command of someone in authority within the mental hospital; they thus have some capacity to conform to a norm. But this is very different from the question of whether they have the capacity to conform to requirements that are not thus immediately symbolized by an attendant or policeman at the elbow. Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way. Commentary to HRS § 704-400.

[15] New Hampshire and District of Columbia.

A.L.I. — MODEL PENAL CODE FORMULATION

We now come to the fourth test — which this jurisdiction has adopted through legislative enactment.[16] The A.L.I. — Model Penal Code formulation for negating criminal responsibility has been widely accepted in all federal circuits except the first and by approximately twenty-six other states either through case law or by statute. Considered by many to be a significant improvement over M'Naghten and other formulations, it has numerous advantages. The test attempts to move towards a formulation that is more realistic and conforms with the practical experience of psychiatrists, recognizing that either the volitional or cognitive aspects of an individual's processes may be impaired. Thus, an individual would be relieved of criminal responsibility if he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Secondly, the test moves away from the absolute requirement of total incapacity and towards one that permits substantial incapacity. Thirdly, the test encourages maximum informational input from expert witnesses while preserving to the jury its role as trier of fact and ultimate decision-maker.

As the Supreme Court of Indiana, one of the state courts that adopted the A.L.I. — Model Penal Code test, stated in *Hill v. State*, 252 Ind. 601, 616, 251 N.E.2d 429, 438 (1969):

It appears that a rule on criminal insanity, expansible and flexible in concept, is necessary and should be advocated.

---

[16] This state had already undertaken to update and reorganize its body of criminal law as a response to the American Law Institute's 1962 publication of a Model Penal Code, the product of a ten-year study of America's criminal laws. In 1963, House Resolution No. 242 requested the Legislative Reference Bureau to make a comparison of Hawaii's and Illinois' criminal law. (Illinois was selected because it had recently codified its penal laws in 1962, using the Model Penal Code as its guide.) A three-part report was prepared and published in April of 1965. In 1966, pursuant to legislative authorization and appropriation, the Judicial Council of Hawaii undertook the task of preparing a proposed revision of the penal laws of the state. Three years later in 1970, the first restatement of Hawaii's criminal law was presented to the State Legislature for enactment as the Hawaii Penal Code. However, the legislature in its deliberations, decided to defer legislative action on the Code until it was formally adopted in 1972.

The A.L.I. rule is such a rule and is an attempt to provide a framework under which the jury will be afforded a complete picture of the defendant's state of mind. It creates a formula for fact finding which takes cognizance of modern medical research in the imprecise area of mental diseases and defects . . . . The jury, as the trier of facts, remains the sole sentinel in the protection of both the rights of the accused and the welfare of society, enabled finally to consider all relevant facts pertaining to the defendant's mental state at the time the act was committed, and being thereby better qualified to render its ultimate moral judgment under the law.

Thus, the present test attempts to alleviate the objectionable features of the previous formulations and must be looked to in deciding whether appellant's motion for a judgment of acquittal was properly denied.

### MOTION FOR JUDGMENT OF ACQUITTAL

Appellant claims that in light of the testimony of its four medical witnesses, the prosecution failed to show that he had substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law's requirements. He argues that all four of his experts diagnosed him as afflicted with a mental disorder and that this was sufficient to generate a reasonable doubt that appellant lacked substantial capacity. Additionally, appellant claims that the prosecution's rebuttal evidence via the written report of Dr. Barthel was insufficient to show that he did have substantial capacity. Lastly, appellant argues that the very nature of the offense — the bizarre and gruesome method of killing the victim — leads "inevitably to the conclusion, by reasonable minds, that appellant was not sane."

In presenting his defense of insanity, appellant attempts to equate medical insanity with legal insanity. However, what psychiatrists may consider a mental disease or defect for medical purposes where clinical treatment is the main concern may not be the same as mental disease or defect for the jury's purpose where an accused's criminal responsibility is

at issue. Appellant's assertions confuse what the main focus should be — namely that legal insanity as defined under HRS § 704-400(1) must govern the determination of appellant's penal liability. When scrutinized in careful detail, the testimony of his four experts elicited on direct examination indicates that reasonable minds could fairly conclude that appellant was sane beyond a reasonable doubt under HRS § 704-400(1).

At trial and in accordance with the form of expert testimony allowed under HRS § 704-410(3) and (4),[17] the four doctors testifying for appellant all made diagnoses of appellant. Dr. Presbrey, after conducting a fifty-minute examination, stated his diagnosis of appellant as "paranoid personality with anti-social features and probable drug intoxication." He proceeded to define "paranoid personality" in lay terms and stated that in his opinion both appellant's capacity to appreciate the wrongfulness of his conduct and conform his conduct to law at the time of the offense were substantially impaired. However, on cross-examination Dr. Presbrey could only say that appellant's capacity to know that what he was doing was wrong was diminished 40% and that his capacity to control himself from committing the offense was impaired about 50%.

Dr. Graham examined appellant for seventy minutes and diagnosed him as a "paranoid personality with sociopathic features." He defined paranoid in much the same way Dr.

---

[17] HRS § 704-410(3) and (4) reads:

(3) When an examiner testifies on the issue of the defendant's responsibility for conduct alleged or the issue of the defendant's capacity to have a particular state of mind which is necessary to establish an element of the offense charged, he shall be permitted to make a statement as to the nature of his examination, his diagnosis of the physical or mental condition of the defendant at the time of the conduct alleged, and his opinion of the extent, if any, to which the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law or to have a particular state of mind which is necessary to establish an element of the offense charged was impaired as a result of physical or mental disease, disorder, or defect at that time.

(4) When an examiner testifies, he shall be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion and may be cross-examined as to any matter bearing on his competency or credibility or the validity of his diagnosis or opinion.

Presbrey had and indicated that sociopathic was another name for anti-social. On direct examination, Dr. Graham stated that appellant's capacity to conform his conduct to fit the requirements of the law was "moderate" but his capacity to appreciate the wrongfulness of his conduct was not impaired in any way. On cross-examination Dr. Graham estimated that appellant's capacity for control was "moderately diminished" and converting it to a percentage stated that it was impaired "probably more than 30%" but that he still thought that appellant had the capacity to know that what he was doing was wrong.

The third doctor to testify as a defense witness was Dr. Lo who also diagnosed appellant as having a "personality disorder containing anti-social and paranoid tendencies." Dr. Lo's opinion as to appellant's impairment in his capacity to conform his conduct to the requirements of the law was "minimum to moderate" but his capacity to appreciate the wrongfulness of his conduct was "less impaired."[18]

Finally, Dr. Furukawa testified that he was contacted by the Public Defender's Office to make a preliminary examination of appellant. Based on this sixty-minute initial exam, which was only for the purpose of deciding whether to recommend further examination and based only on other reports — medical and police, Dr. Furukawa concluded that appellant suffered from "paranoid schizophrenia" which he explained differed from paranoid personality in that the paranoid schizophrenic is classified in medical terms as "mentally ill," a more severe dysfunction. The paranoid personality has a personality disorder, not necessarily identified as a mental illness.[19] When questioned as to the extent of appellant's impairment, Dr. Furukawa stated that in terms of

---

[18] Dr. Lo's opinion was based on appellant's supposed substance intoxication. Although the exact amount of alcohol appellant had imbibed on the night of the fatal stabbing was never determined, Dr. Lo testified that he based his opinion on what appellant told him and based on appellant's long medical history of substance abuse.

[19] For a more detailed discussion of the difference between "paranoid schizophrenia" and "paranoid personality" see R. ALLEN ET AL., READINGS IN LAW AND PSYCHIATRY 50, 53 (1968).

numbers appellant was at least 74% lacking in capacity in both the cognitive and volitional sense as a result of the paranoid schizophrenia.

As stated previously, the standard for a motion for judgment of acquittal where insanity is raised as a defense is that it is a jury question unless a reasonably minded jury viewing the facts and inferences in the light most favorable to the prosecution must necessarily possess a reasonable doubt as to the defendant's sanity. The nature and quantum of rebuttal evidence sufficient to present a jury question is to some extent determined by the strength of the case for insanity. *United States v. Bass*, 490 F.2d 846, 851 (5th Cir. 1974). Therefore, the strength of defendant's expert witnesses must be assessed in determining whether appellant could be considered legally insane. The three doctors appointed to the sanity commission — Dr. Presbrey, Dr. Graham and Dr. Lo — agreed that appellant suffered from a personality disorder rather than a mental disorder. Their assessments of the degree of appellant's impairment ranged from "30% impairment" and "minimal" impairment to "moderate" impairment. The only doctor who felt that appellant's capacity was "markedly impaired" or with an impairment of "at least 74%" was Dr. Furukawa who admitted that his examination was not as thorough as it would have been had he been examining appellant for purposes other than a preliminary check.[20] Thus, the three psychiatrists who examined appel-

---

[20] In Winn v. United States, 270 F.2d 326 (D.C. Cir. 1959) the court stated:

There is a vast difference between that mental state which permits an accused to be tried and that which permits him to be held responsible for a crime. Examinations, made for the purpose of determining his competency to stand trial require less than examinations designed to determine sanity for the purpose of criminal responsibility. (Citations omitted). It is not to be assumed, therefore, that a psychiatrist who has been ordered to prepare an opinion as to a man's trial competency will conduct the type of examination which is necessary to provide the trier of facts with the information essential for a proper determination of criminal responsibility. In addition to the psychological and neurological tests which may be indicated, that determination requires adequate knowledge and a proper expert evaluation of the accused's personal history and the circumstances surrounding the crime.

*See* United States v. Schultz, 431 F.2d 907, 912 (8th Cir. 1970).

lant specifically for the purpose of determining his capacity to appreciate the wrongfulness of his conduct or his capacity to conform his conduct to the law's requirements implicitly agreed that his capacity as to both these abilities was substantial within the meaning of HRS § 704-400(1) as defined in our discussion of "substantial" in Part II of this opinion.

Appellant places great emphasis on the fact that the very nature of the crime and the bizarre and gruesome circumstances surrounding it was indicative of appellant's insanity. However, the fact of the crime's bizarreness and emotional impact is not by itself a proper foundation from which experts should render opinions as to appellant's psychiatric condition. Sole reliance on bizarreness would result in the psychiatrists explaining appellant's mental state on the basis of the crime rather than vice versa.

The fact of the alleged bizarreness of the crime itself is insufficient to establish legal insanity. As the Appellate Court of Illinois, First District, stated in *People v. Horton*, 29 Ill. App. 3d 704, 711, 331 N.E.2d 104, 110 (1975):

Although it might be justified in one sense to characterize the circumstances of the shooting as "bizarre," in the same sense, one could characterize most any crime of violence as "bizarre." Such an observation does not compel a finding of mental disease or defect sufficient to exonerate one from criminal liability.

*See also People v. Lono*, 11 Ill. App. 3d 443, 449, 297 N.E.2d 349, 354 (1973) (commission of atrocious crimes are not in themselves evidence of insanity). In sum, the evidence was sufficient to convince a reasonably minded juror that the defendant was sane beyond a reasonable doubt. The trial court was correct in denying the motion for a judgment of acquittal.[21]

---

[21] The trial court's decision is most consistent with the policy behind the current A.L.I. — Model Penal Code test which seeks to keep the ultimate question of insanity — a question of criminal responsibility — in the jury's hands. The psychiatrist and jury in a criminal case where insanity is an issue are concerned with two entirely different questions. The psychiatrist deals with the question of the defendant's behavior from a clinical standpoint in medical terms. On the other hand, the

## II.

### JURY INSTRUCTION

Appellant's second argument on appeal is that the trial court's instruction defining "lack of substantial capacity" as "capacity which has been impaired to such a degree that only an extremely limited amount remains" was unfair and prejudicial to him. He states that such a modification was without precedent and was contrary to the rationale of HRS § 704-400 as embodied in the Commentary to that section.

As discussed previously in this opinion, one of the objectionable features of the M'Naghten test was its requirement that the defendant's incapacity be total. Thus, the A.L.I. — Model Penal Code standard sought to modify this objection by requiring something less than total incapacity:

> By employing the telling word "substantial" to modify "incapacity" the rule emphasizes that "any" capacity is not sufficient to justify avoidance of criminal responsibility, but that "total" incapacity is also unnecessary.

*United States v. Freeman* 357 F.2d 606, 623 (2d Cir. 1966).

The Commentary itself uses the phrase "extremely limited capacity for self-control or cognition" in talking about persons lacking capacity as a result of a mental disease, disorder, or defect. As the Commentary explains:

> The Code does not demand total incapacity; it requires substantial incapacity. The word "substantial" is, of course, imprecise, but seeking precision in designating the degree of impairment that will preclude responsibility is as foolish as requiring total impairment. As the commentary to the Model Penal Code states: "To identify the

---

jury has the duty to determine the criminal responsibility of the defendant which is a broader question than that faced by the doctors. This issue includes the questions not only of whether the defendant had a mental defect or disease at the time of the alleged offense, but also of whether any such defect or disease, if found to exist, met the legal test of insanity, as an accused may have a mental disorder or deficiency and in some cases still be mentally competent to be held legally responsible for his crime. Mims v. United States, 375 F.2d 135, 142 (5th Cir. 1967).

degree of impairment with precision, is, of course, impossible both verbally and logically. The recommended formulation is content to rest upon the term 'substantial' to support the weight of judgment; if capacity is greatly impaired, that presumably should be sufficient.'' An expert witness, called upon to assess a defendant's capacity at a prior time (which, of course, the witness probably did not observe), can hardly be asked for a more definitive statement — even in the case of extreme conditions.

Commentary to HRS § 704-400, p. 263. The Commentary recognizes the difficulty of defining "substantial" with any degree of precision. However, another reason for this state's adoption of the A.L.I. — Model Penal Code test was that it encouraged maximum informational input from the expert witnesses while preserving to the jury its role as trier of fact and ultimate decision-maker on the issue of criminal responsibility.

In *State v. Johnson*, 399 A.2d 469 (1979), the Supreme Court of Rhode Island addressed the sole issue of whether it should abandon the M'Naghten test in favor of the A.L.I. standard for determining criminal responsibility. The court concluded that it would adopt the A.L.I. "substantial capacity formulation" and discussed in general terms how the standard should forthwith be applied.

The standard must be phrased in order to make fully available to the jury such psychiatric information as medical science has to offer regarding the individual defendant, yet be comprehensible to the experts, lawyers, and jury alike. Finally, the definition must preserve to the trier of facts, be it judge or jury, its full authority to render a final decision. (Citations omitted). These considerations are paramount in our consideration of the rule to be applied in this jurisdiction in cases in which the defense of lack of criminal responsibility due to a mental illness is raised.

*Id.* at 471. In extolling the virtues of the new formulation, the court continued:

Our new test emphasizes that the degree of "substantial" impairment required is essentially a legal rather than a

medical question. Where formerly under M'Naghten total incapacity was necessary for exculpation, the new standard allows the jury to find that incapacity less than total is sufficient. Because impairment is a matter of degree, the precise degree demanded is necessarily governed by the community sense of justice as represented by the trier of fact.

*Id.* at 477.

Although numerous courts have adopted the A.L.I. — Model Penal Code formulation as their governing test for criminal responsibility, very few have spoken on precisely how the test should be explained to a jury. However, a number of these courts have stated that the instructions should be flexible with wide discretion vested in the trial judge to clarify the terms of the definition. *United States v. Smith*, 404 F.2d 720 (6th Cir. 1968); *United States v. Chandler*, 393 F.2d 920 (4th Cir. 1968).[22]

In the present case, the trial court's use of "extremely limited" conveyed the necessary meaning of the word "substantial" in the context of the definition of legal insanity without changing its meaning. The effect of the trial judge's modification was to clarify for the jury the definition of legal insanity so that the jury could perform its proper role of

---

[22] In United States v. Chandler, 393 F.2d 920 (4th Cir. 1968), the United States Circuit Court of Appeals for the Fourth Circuit approved the A.L.I. test of insanity and spoke generally as to how its terms should be applied:

Approval of any standard or form of instruction need not, and should not, freeze the language or solidify thought. In formulating specific instructions to a jury or the standards which control a court's findings, the particular circumstances of the case may not be disregarded, and the issue as framed by the testimony may require changes in the choice of words . . . . There should be room for constructive innovation and improvement. We embrace today's advances, but we abjure any formalistic approach which might foreclose variation. We should not prescribe for invariable use a form of words which may be less appropriate than another in the light of the testimony in a particular case and which have been uncovered. In short, while our approval of the American Law Institute's formulation is unequivocal and unreserved, we proscribe no other form of words which may appear more appropriate in a given case now or in cases generally in the future.

That changes will come in the future is both desirable and certain.
*Id.* at 926-927.

incorporating all the testimony at trial and intelligently apply the legal formula in determining the ultimate question of the accused's guilt or innocence.

Trial courts should not be restricted to merely repeating the terms of the statute. *United States v. Smith*, 404 F.2d 720 (6th Cir. 1968).

> Jury instructions that merely repeat the statute ask the jury to answer questions which legal scholars have debated for over a century; without interpretive instructions, jury deliberations inevitably will lead to arguments over definitions and speculations as to the scope of the defense.

52 ORE. L. REV. 285, 288 (1973). As the United States Circuit Court of Appeals for the Eighth Circuit stated in *United States v. Frazier*, 458 F.2d 911, 917 (8th Cir. 1972):

> Clarity is the true virtue of effective communication. Although language of instructions may include the "bare bones" of the insanity tests (cognition, volition (choice) and will) if it fails to properly communicate the intended legal meaning the law serves an absurd end.

The instruction used was effective in clarifying the meaning of "substantial" and in implementing the policy behind HRS § 704-400(1). We find that no prejudice to appellant resulted in its use and his conviction is hereby affirmed.

*Renee M. L. Yuen (Yuen & Perkins* of counsel) for Defendant-Appellant.

*Albert H. Esposito,* Deputy Prosecuting Attorney *(Togo Nakagawa,* Prosecuting Attorney) for Plaintiff-Appellee.