105 P.3d 258

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Mario CORDERO, Defendant–Appellant.**

**No. 26158.**

Intermediate Court of Appeals of Hawai'i.

Dec. 30, 2004.

Jonathan A. Iida, Deputy Public Defender, State of Hawai'i, on the briefs, for defendant-appellant.

Mary Ann Holzl–Davis, Deputy Prosecuting Attorney, County of Hawai'i, on the briefs, for plaintiff-appellee.

BURNS, C.J., and LIM, J.; and NAKAMURA, J., concurring.

Opinion of the Court by LIM, J.

Mario Thomas Cordero, Sr. (Cordero) appeals the August 18, 2003 judgment upon a bench trial in the family court of the third circuit [1] that convicted him of abuse of family or household member, a violation of Hawaii Revised Statutes (HRS) §§ 709–906(1) and –906(4) (Supp.2003).[2]

---

1. The Honorable George S. Yuda, judge presiding.

2. Hawaii Revised Statutes (HRS) § 709–906 (Supp.2003) provides, in pertinent part:

 (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household

member, upon request, may transport the abused person to a hospital or safe shelter.

For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.

(2) Any police officer, with or without a warrant, may arrest a person if the officer has

Cordero contends "there was insufficient evidence to show that ... the police had reasonable grounds to believe that there was physical abuse or harm inflicted by Mr. Cordero upon Julia[ Hoke, the complaining witness]." Opening Brief at 18. We agree, and reverse.

## I. Background.

On September 27, 2002, the State filed a complaint against Cordero, which read as follows:

On or about the 26th day of September, 2002, in South Hilo, County and State of Hawaii, MARIO CORDERO did intentionally, knowingly or recklessly refuse compliance with the lawful order of a police officer to leave the premises at 622A Wainaku Street, Hilo, Hawaii, thereby committing the offense of Abuse of Family or Household Member, in violation of Section 709–

906(1) and (4), Hawaii Revised Statutes, as amended.

Cordero went to trial on March 7, 2003.

Julia testified first for the State. Cordero is her father. On September 26, 2002, she and her family (her husband and their five children) were living with her parents in a house owned by her uncle. The house connects to the county roadway via a private driveway that also serves several other lots. At around 5:50 p.m., Julia called the police because

my father and I was getting into a argument, and it was getting really bad. There was a lot of shoving and pushing.

And he was threatening to call the police on a Saturday, and I just said, "Why not call the police now?" And he said, "Go ahead." So I called the police.

When a police officer arrived, Julia told him her side of the story, then Cordero had his turn. Julia interrupted and cajoled, "You

reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member and that the person arrested is guilty thereof.

(3) A police officer who has reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member shall prepare a written report.

(4) Any police officer, with or without a warrant, may take the following course of action where the officer has reasonable grounds to believe that there was physical abuse or harm inflicted by one person upon a family or household member, regardless of whether the physical abuse or harm occurred in the officer's presence:

(a) The police officer may make reasonable inquiry of the family or household member upon whom the officer believes physical abuse or harm has been inflicted and other witnesses as there may be;

(b) Where the police officer has reasonable grounds to believe that there is probable danger of further physical abuse or harm being inflicted by one person upon a family or household member, the police officer lawfully may order the person to leave the premises for a period of separation of twenty-four hours, during which time the person shall not initiate any contact, either by telephone or in person, with the family or household member; provided that the person is allowed to enter the premises with police escort to collect any necessary personal effects;

(c) Where the police officer makes the finding referred to in paragraph (b) and the incident occurs after 12:00 p.m. on any Friday,

or on any Saturday, Sunday, or legal holiday, the order to leave the premises and to initiate no further contact shall commence immediately and be in full force, but the twenty-four hour period shall be enlarged and extended until 4:30 p.m. on the first day following the weekend or legal holiday;

(d) All persons who are ordered to leave as stated above shall be given a written warning citation stating the date, time, and location of the warning and stating the penalties for violating the warning. A copy of the warning citation shall be retained by the police officer and attached to a written report which shall be submitted in all cases. A third copy of the warning citation shall be given to the abused person;

(e) If the person so ordered refuses to comply with the order to leave the premises or returns to the premises before the expiration of the period of separation, or if the person so ordered initiates any contact with the abused person, the person shall be placed under arrest for the purpose of preventing further physical abuse or harm to the family or household member; and

(f) The police officer may seize all firearms and ammunition that the police officer has reasonable grounds to believe were used or threatened to be used in the commission of an offense under this section.

. . . .

(8) Any police officer who arrests a person pursuant to this section shall not be subject to any civil or criminal liability; provided that the police officer acts in good faith, upon reasonable belief, and does not exercise unreasonable force in effecting the arrest.

know, dad, tell the truth." Cordero got "really upset," and started yelling and confronting the officer about doing his job. The officer asked Julia if she and her family would leave the premises, but the family had no place of their own and there was no room at the homeless shelter. The officer then asked Julia's parents if they would leave, but they demurred. In the course of these colloquies, Cordero remained loudly vociferous and upset. The officer threatened to arrest Cordero, but another police officer arrived and removed Cordero from the house. Then,

My father was ranting and raving up and down the road saying all kinda t'ings, um, just going off, um, for about an hour.

Um, the officers came to me and they was explaining to me that they're gonna ask him, um, my father, if he would sign the citation and if he would leave.

He wouldn't leave. He wouldn't sign the citation so they told me that they were gonna arrest him. For Abuse of a Family Household member.

On cross-examination, Julia remembered that when her argument with her father first became heated, her mother stepped between them and exhorted them to stop, but to no avail: "my father kept coming towards me so I kept going towards him." Julia also recalled that when the first police officer arrived, she and her father were sitting at the kitchen table.

Police officer Derek Morimoto (Officer Morimoto) testified that he was dispatched to a "domestic dispute" that evening. When Officer Morimoto arrived at the Cordero household, Officer Asuncion was already in the house. Officer Morimoto saw Julia and her father arguing in the dining room area. He noticed that Cordero's hands were clenched. There were at least three or four people in the dining room area. Cordero was yelling in a loud voice. Cordero was also yelling at Officer Asuncion. The confrontation appeared to escalate, so Officer Morimoto took Cordero out of the house into the garage area and tried to talk him down:

Uh, that time I tried to talk to him, you know, to calm him down. Uh, at this time he just started, uh, you know, yelling, uh, at me, getting in—in my face, uh, pointing

his finger in my face; and he was also telling me, uh, about, uh, that another family member was gonna get evicted out of the house soon. And at that time he started to walk up and down the, uh, driveway.

As Cordero walked up and down the driveway, Officer Morimoto kept trying to pacify him, but Cordero continued to yell at Officer Morimoto. Cordero was also yelling at Julia's husband, Arthur Hoke (Arthur), who was sitting in the garage, "about evicting him in a few days." Officer Asuncion then told Officer Morimoto that Cordero would be issued a "warning citation." After the citation was issued, Officer Morimoto helped Officer Asuncion handcuff Cordero. Cordero did not resist. On cross-examination, Officer Morimoto acknowledged that he "never saw Mr. Cordero hit anyone or anything[.]"

Officer Asuncion testified that he responded to "a domestic" on the evening in question. When he arrived at the house, he knocked on the door and Cordero invited him in. Officer Asuncion entered and asked the assemblage whether everything was okay. He noticed Julia off to the side, crying. Cordero "appeared to be very agitated. He was yelling and, uh, screaming at his daughter and at myself." After Officer Morimoto escorted Cordero out of the house, Officer Asuncion spoke with Julia. Officer Asuncion believed that Cordero was "the aggressor[.]" Officer Asuncion decided that Cordero could not remain at the house, because "we felt that if we left him there things would've get little bit more worse, possibly become physical." Officer Asuncion asked Cordero to leave the premises voluntarily, but Cordero balked. Cordero's wife was asked to call someone to come and take Cordero away, so she called their daughter-in-law. But when the daughter-in-law arrived, Cordero refused to go with her. Officer Asuncion thereupon issued a "24–hour citation" to Cordero.

Officer Asuncion confirmed that he read the citation to Cordero, verbatim, and explained it. Officer Asuncion told Cordero that if he did not comply with the citation by leaving the premises, he would be subject to arrest. This did not faze Cordero, who told Officer Asuncion, "the only way we was gonna have him leave is to arrest him." Officer

Asuncion asked Cordero to sign the citation, to no avail. Cordero's daughter-in-law signed the citation instead, thereby purportedly acknowledging that the police explained the citation to her father-in-law. Officer Asuncion estimated that Cordero was asked to leave "at least half a dozen times." But Cordero continued to insist that the only way he would go was under arrest, so he was placed under arrest. Officer Asuncion figured that he spent about an hour trying to get Cordero to go. Officer Asuncion described Julia's demeanor during the incident: "Well, she was, uh, crying so she was, I guess, afraid. Um, but other than that she—she spoke like she was, um, at the time, uh, able to comprehend what I was—what I was asking her." On cross-examination, Officer Asuncion admitted that he did not see Cordero take a swing at anyone, or hit or damage any property.

Cordero was the only witness for the defense. He explained that the whole thing started when he was making dinner. He went to the kitchen sink to rinse a bowl, but in doing so he inadvertently soiled some water his granddaughter had in a pot to make coffee. His granddaughter upbraided him, and mumbled something that he could not make out. When Arthur and Julia came into the kitchen, Cordero told them they had better discipline their daughter. Cordero and Julia started yelling at each other, and the argument was on: "Well, she come to me. Then I went to her. Then we start saying lot of things." Cordero's wife appeared, interposed herself and tried to break it up. The argument abated when Julia told Cordero she was going to call the police. Cordero replied, "Go right ahead." He then sat down to his dinner.

Officer Asuncion knocked at the door while Cordero was still eating dinner. Cordero recalled that his wife, his daughter Julia, his granddaughter and his cousin were also in the kitchen at the time. Cordero invited Officer Asuncion in, and Officer Asuncion asked, "What's happening?" Officer Asuncion first questioned Julia, then Cordero. During the latter inquiry, Julia interrupted, and that made Cordero angry. He was standing, yelling and gesticulating, when he heard a loud voice. Officer Morimoto had arrived and positioned himself behind Cordero. Officer Morimoto asked Cordero to go outside because Cordero was upset and yelling. Cordero complied.

Outside the house, Officer Morimoto offered Cordero a chance to tell his side of the story, but Cordero saw Arthur in the garage and told Officer Morimoto, "Tell her—tell my son-in-law for go in the house so I can say what wen happen." Cordero was reluctant to talk in front of Arthur because Cordero feared Arthur would interrupt him just as Julia had. Officer Morimoto went over to Arthur and asked him to go in the house. Arthur agreed to leave after he finished smoking his cigarette, but Arthur ultimately stayed put.

Upset because of a perceived indifference to his side of the story, Cordero began walking up and down the driveway, all the way to the county roadway and back, yelling that "my son-in-law get six days to leave the premises." Cordero recalled that at some point, someone told him to leave the premises, but Cordero felt he had already left by walking away from his house onto the driveway. As for the "24–hour citation," the only thing Cordero could remember was refusing to sign the citation. He did not recall a police officer explaining the citation to him. He had no idea how long he was supposed to stay away from the premises. He did remember, however, that someone else signed the citation. Several minutes after that, Cordero was arrested near the county roadway. When asked how he felt about being told to leave the premises, Cordero explained: "I get more upset because I lived, uh, we live ovah there it's more than 25 years, and we have to leave our own house."

At the end of direct examination, Cordero mentioned that he has a hearing problem which necessitates yelling just to hear himself talk. On cross-examination, Cordero explained that he does not wear a hearing aid because he cannot afford one. He acknowledged he can read and write, but denied that Officer Asuncion showed him the 24–hour citation and explained it to him: "That night was kinda dark kinda moon. I cannot see the citation. I—I only I can hear a voice. I

see the thing in front me. That's it." Cordero reiterated his belief that he had in fact left the premises by going onto the driveway. When asked whether he was "mad" that night, Cordero countered, "I was upset."

After closing arguments, the family court found Cordero guilty. In the course of its oral ruling, the family court observed:

The other part that comes into the picture is rather common-sensical. It was an incident of high emotion. Everybody—and I'm sure everybody that includes the granddaughter who was at the sink—um, recognized that there was a domestic abuse or, excuse me, a domestic incident going on and that something had to be done to bring peace to that situation.

Cordero was sentenced to two years of probation, upon terms and conditions including two days in jail, with credit for one day of time already served. At the sentencing hearing, Julia made a statement to the family court, which she prefaced as follows:

The only thing that I want, Your Honor, is for this whole mess to end. My father didn't physically, um, abuse me, but he caused a lot of pain and hurt to my family, and my kids are suffering now. And, um, what I want—what my family wants is for us to, um, have ho'oponopono so that we can close this and move on with our lives.

## II. Discussion.

 Cordero stakes out three points of error on appeal:

1. In the instant case, the lower court erred in adjudging

Mr. Cordero guilty of Abuse of Family or Household Member in violation of HRS § 709–906 because the State failed to ad-

duce substantial evidence that Officer Asuncion had reasonable grounds to believe that there was recent physical abuse or harm inflicted by one Mr. Cordero upon Julia....

. . . .

2. The Court also erred in convicting Mr. Cordero of Abuse of Family and Household Member because there was insufficient evidence to support a finding that the police officer had "reasonable grounds to believe that there was a probable danger of further physical abuse or harm being inflicted" by Mr. Cordero upon Julia....

. . . .

3. The lower court also erred in convicting Mr. Cordero of Abuse of Family or Household Member in violation of HRS § 709–906 because the police officer did not issue a written warning citation to Mr. Cordero as required under HRS § 709–906.

Opening Brief at 10–13.[3] Because our agreement with Cordero's first point is dispositive, we need not reach the second and third: "It is well established, as a precept of constitutional as well as statutory law, that an accused in a criminal case can only be convicted upon proof by the prosecution of every element of the crime charged beyond a reasonable doubt. *State v. Nuetzel*, 61 Haw. 531, 606 P.2d 920 (1980); *State v. Napeahi*, 57 Haw. 365, 556 P.2d 569 (1976); HRS § 701–114 (1976)." *State v. Lima*, 64 Haw. 470, 474, 643 P.2d 536, 539 (1982). *See also* HRS § 701–114 (1993).

In *State v. Kapela*, 82 Hawai'i 381, 922 P.2d 994 (App.1996), we laid out the material elements of a cognate offense under HRS §§ 709–906(1) and –906(4) (Supp.1992):

3. The standard of review for sufficiency of the evidence is well established;

namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every ma-

terial element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Ferrer*, 95 Hawai'i 409, 422, 23 P.3d 744, 757 (App.2001) (citation and block quote format omitted).

Defendant was charged with failure to comply with the lawful order of a police officer under HRS § 709–906(1) and (4). To sustain a conviction for this offense, the State was required to prove beyond a reasonable doubt the following four elements:

(1) that a police officer had reasonable grounds to believe that there was recent[4] physical abuse or harm[5] inflicted by Defendant upon Complainant, a family or household member;

(2) that the officer had reasonable grounds to believe that there was a probable danger of further physical abuse or harm being inflicted by Defendant upon Complainant;

(3) that the officer issued a written warning citation to Defendant, ordering him to leave the home for a cooling-off period of twenty-four hours or a specified enlarged period if the incident occurred after 4:30 p.m. on any Friday, or on any Saturday, Sunday or legal holiday; and

(4) that Defendant returned to the home before the expiration of the cooling-off period.[6]

*Kapela*, 82 Hawai'i at 387, 922 P.2d at 1000 (footnotes supplied). In addition, we held, in response to Kapela's constitutional claim of vagueness and overbreadth, that

contrary to Defendant's allegation, a warning citation cannot be issued purely on a complainant's claim that he or she was beaten or abused. There must be other objective facts and circumstances which would warrant a reasonable police officer to believe the complainant's claim.

*Id.* at 393, 922 P.2d at 1006. *See also State v. Alvarez*, 96 Hawai'i 42, 47–48, 25 P.3d 817, 822–23 (App.2001).

▮ In this appeal, Cordero first contends there was no evidence below to show physical abuse or harm to Julia or anyone else in the household. Cordero also faults the police officers for failing to adequately investigate the required reasonable grounds for this threshold finding. The State answers by citing the reasonable grounds found in *Kapela*—the complainant, shaking, distraught and crying, told arriving police officers that her boyfriend had hit her on the head with a walkman radio, and showed them the resulting injuries, *Kapela*, 82 Hawai'i at 384, 922 P.2d at 997—and thus urging a favorable comparison for the evidence below:

In the present case, Julia testified that there was pushing and shoving between her and the Defendant. Julia testified that she told her side of the story to the officers. Officer Asuncion testified that he spoke to Julia when he arrived on the scene. Officer Asuncion testified that Julia was crying when he spoke to her. Officer Asuncion testified that, based on his observations of the Defendant while at the scene, the Defendant was the aggressor in the situation.

Thus by using the standard set forth in *Kapela*, the State provided sufficient evidence to the Court establishing that Officer Asuncion had reasonable grounds to

---

**4.** Note the present incarnation of the statute, HRS § 709–906(4) (Supp.2003), apposite here, which does not require that the physical abuse or harm be "recent."

**5.** *See State v. Kameenui*, 69 Haw. 620, 623, 753 P.2d 1250, 1252 (1988) (the HRS § 709–906(1) and HRS §§ 706–906(1) and –906(4) offenses refer, respectively, to "causing physical injury" and "physically harming someone" (citations omitted)). *Cf. State v. Tomas*, 84 Hawai'i 253, 257, 933 P.2d 90, 94 (App.1997) ("to 'physically abuse' someone under HRS § 709–906(1) means to maltreat in such a manner as to cause injury, hurt or damage to that person's body" (citations and some internal quotation marks omitted)); *State v. Nomura*, 79 Hawai'i 413, 415–16, 903 P.2d 718, 720–21 (App.1995) (in a prosecution for abuse of family or household members, jury instructions defining "physical abuse" as "causing bodily injury to another person[,]" and "bodily injury" as "physical pain, illness or any impairment of physical conditions [sic,]" were not incorrect (block quote format omitted)).

**6.** *But see* HRS § 702–204 (1993) ("When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly"). *Cf. State v. Eastman*, 81 Hawai'i 131, 140, 913 P.2d 57, 66 (1996) (pursuant to HRS § 702–204, "the requisite state of mind for a violation of HRS § 709–906(1) is that of acting intentionally, knowingly, or recklessly"). *See also State v. Alvarez*, 96 Hawai'i 42, 47, 25 P.3d 817, 822 (App. 2001).

believe that physical abuse or harm had occurred between Julia and the Defendant. Answering Brief at 8 (record citations omitted). Indubitably, this comparison is not flattering to the cause of the State.

More to the point, we agree with Cordero that there was not sufficient evidence below of physical abuse or harm upon which the police could have reasonably grounded such a finding. Officer Asuncion obliquely admitted as much, when he testified that "we felt that if we left [Cordero] there things would've get little bit more worse, possibly become physical." The family court seems to have also indicated as much in its oral ruling. Granted, Officers Morimoto and Asuncion encountered what might be considered an inflammatory imbroglio. But even if we take the evidence in the light most favorable to the State, *State v. Ferrer*, 95 Hawai'i 409, 422, 23 P.3d 744, 757 (App.2001), there was simply not substantial evidence—indeed, very meager evidence if any at all—to meet the threshold reasonable grounds required by HRS § 709–906(4).

### III. Conclusion.

Accordingly, the judgment of the family court is reversed.

### Concurring Opinion by NAKAMURA, J.

I concur in the result. I write separately because my concurrence hinges on my interpretation of the "reasonable grounds to believe" language in Hawaii Revised Statutes (HRS) § 709–906(4) (Supp.2003) as imposing the probable cause standard, rather than a less stringent standard. This interpretation is based on reading HRS § 709–906(4) in *pari materia*[1] with HRS § 709–906(2) (Supp. 2003) and the legislative history of HRS § 709–906(4).

HRS §§ 709–906(2) and 709–906(4) provide in pertinent part:

> (2) Any police officer, with or without a warrant, may arrest a person if the officer has *reasonable grounds to believe* that the

person is physically abusing, or has physically abused, a family or household member and that the person arrested is guilty thereof.

> . . . .

> (4) Any police officer, with or without a warrant, may take the following course of action where the officer has *reasonable grounds to believe* that there was physical abuse or harm inflicted by one person upon a family or household member, regardless of whether the physical abuse or harm occurred in the officer's presence:

> . . . .

>> (b) Where the police officer has *reasonable grounds to believe* that there is probable danger of further physical abuse or harm being inflicted by one person upon a family or household member, the police officer lawfully may order the person to leave the premises for a period of separation of twenty-four hours . . . ;

>> . . . .

>> (e) If the person so ordered refuses to comply with the order to leave the premises or returns to the premises before the expiration of the period of separation, or if the person so ordered initiates any contact with the abused person, the person shall be placed under arrest for the purpose of preventing further physical abuse or harm to the family or household member[.]

(Emphasis added).

The majority opinion focuses on the threshold requirement of HRS § 709–906(4) that a police officer has "reasonable grounds to believe" that there was physical abuse or harm inflicted on a family or household member. It concludes that there was insufficient evidence to prove this element and thus does not reach the other points of error raised by the defendant.

Probable cause is required for an arrest under both the United States Constitution

---

1. Hawaii Revised Statutes (HRS) § 1–16 (1993) provides:

 Laws in pari materia, or upon the same subject matter, shall be construed with reference to

each other. What is clear in one statute may be called in aid to explain what is doubtful in another.

and the Hawai'i Constitution. *State v. Navas*, 81 Hawai'i 113, 115–16, 913 P.2d 39, 41–42 (1996); *State v. Gustafson*, 55 Haw. 65, 70 n. 2, 515 P.2d 1256, 1259 n. 2 (1973). Therefore, the phrase "reasonable grounds to believe" as used in HRS § 709–906(2) (the arrest provision), which authorizes a police officer to arrest a person for physically abusing a household member, must impose the probable cause standard. The identical "reasonable grounds to believe" language used in HRS § 709–906(4) (the "stay-away" provision) must likewise be construed as imposing the probable cause standard. *Gaspro, Ltd. v. Comm'n of Labor and Industrial Relations*, 46 Haw. 164, 172, 377 P.2d 932, 936 (1962) ("In the absence of an express intention to the contrary, words or phrases used in two or more sections of a statute are presumed to be used in the same sense throughout.").

Construing the phrase "reasonable grounds to believe" in HRS § 706–906(4) as requiring probable cause is also supported by its legislative history. The "reasonable grounds to believe" language appeared in the version of the arrest and "stay-away" provisions contained in the original statute enacted in 1973. 1973 Haw. Sess. L. Act 189, § 1 at 323–24. The committee report accompanying the original legislation described the "stay-away" provision as establishing a course of action for a police officer to follow

in cases where the physical harm inflicted on the alleged victim was "readily apparent." Hse. Stand. Com. Rep. No. 657, in 1973 House Journal 1065.[2] The committee report's reference to the physical harm inflicted being "readily apparent" reinforces my conclusion that the Legislature intended to impose the probable cause standard.

Police officers would have greater flexibility to diffuse potentially violent domestic situations if HRS § 706–906(4) imposed a less stringent standard such as reasonable suspicion with respect to whether physical abuse or harm had been inflicted. However, based upon my reading of HRS § 706–906(4), the Legislature required probable cause as the threshold for the police to take action under the "stay-away" provision.

In my view, the prosecution failed to introduce substantial evidence that the police officers had probable cause to believe that the defendant had inflicted physical abuse or harm on his daughter. Accordingly, I agree that the judgment of the family court must be reversed.

---

**2.** The 1973 legislation only permitted a police officer to arrest for physical abuse when the abuse occurred in the officer's presence.1973 Haw. Sess. L. Act 189, § 1 at 323.